2022 IL App (4th) 210713

NO. 4-21-0713

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 17, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| VICTORIA L. BAKER, | ) | No. 19CF1268 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices DeArmond and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        Following a jury trial, defendant, Victoria L. Baker, was found guilty of harassing

a witness (720 ILCS 5/32-4a(a)(2) (West 2018)). The trial court sentenced her to 120 days in jail

and 30 months' probation. Defendant appeals, arguing (1) the State failed to prove her guilty

beyond a reasonable doubt, (2) the court committed reversible error when responding to a question

from the jury during its deliberations, (3) prosecutorial error denied her a fair trial, and (4) her

defense counsel was ineffective for failing to file an assessment waiver. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In April 2019, defendant's sister, Cynthia Baker (also referred to in the record as

Cynthia Clay), was arrested and charged in McLean County case No. 19-CF-416 with the murder

of her boyfriend's eight-year-old daughter, Rica Rountree. Cynthia remained in jail following her

arrest, and from November 12 to 19, 2019, her jury trial was conducted. Her boyfriend, Richard Rountree, was subpoenaed to testify as a witness at her trial. Cynthia was ultimately convicted of murder and sentenced to life in prison. Following her trial, Richard also faced charges in connection with Rica's death. In January 2020, the State charged him with child endangerment. He pleaded guilty to that offense and was sentenced to eight years in prison.

¶ 4　　　　In December 2019, the State charged defendant with harassment of a witness (*id.*), based on contact she had with Richard during the course of Cynthia's trial. Specifically, it alleged that on or about November 16, 2019, defendant, or one for whose conduct she was legally responsible, communicated with Richard "with the intent to harass or annoy" because of Richard's potential testimony in a pending legal proceeding. The State further alleged that such communication caused Richard mental anguish or emotional distress.

¶ 5　　　　In September 2021, defendant's jury trial was conducted. Emma Hollings testified for the State that she was incarcerated at the McLean County jail in 2019 and involved in a "work release program" that permitted her to leave the jail and go to work. While in jail, Hollings became familiar with Cynthia, who was also incarcerated. Hollings testified that, at some point, an inmate named Mary asked if she would deliver a letter for Cynthia to Cynthia's sister, whom Hollings identified as defendant. Hollings recalled putting the letter in her pants as she was leaving the jail to go to work. She called defendant to tell her where she lived, and defendant came to her residence to pick up the letter. According to Hollings, the two "really didn't engage" and she "just gave [defendant] the letter." She stated she never read the letter, no one told her what was in the letter, and she did not direct defendant to deliver the letter to anyone.

¶ 6　　　　Richard testified he had known defendant for approximately four years. He agreed that they had a close relationship, defendant was someone he trusted, and the two had frequent

contact. On Saturday, November 16, 2019, while Cynthia's trial was ongoing, Richard received a phone call from defendant. She stated that she had to see him and she had "something to give [him]." Around 1:15 p.m., Richard met defendant in the parking lot of the business where he worked. He testified that he got into defendant's car and defendant gave him a letter. They remained in the parking lot for approximately 53 minutes. During that time, Richard read the letter and asked defendant to also read it.

¶ 7 The letter was admitted into evidence. The record reflects it was not addressed to anyone or signed and that it stated as follows:

"This court s*** is not working the way we thought it would. I know you nor I did anything to cause this. But it has come down to either you or I doing time. I really can't do this. They are going to give me [a] life sentence for something I didn't do. I can't go without my kids and family and you. I will just kill myself before I let that happen. I know you are stressed about this as well but I really need you to take the blame for this. Please just tell them in court that you kicked her. I know the timing isn't right but you did kick her and that may have caused damage. When you slammed her against the door and made her head bleed or when you was [sic] hitting her in the stomach and chest that could have caused damage. I know this sounds cold hearted but when I hit her with a belt it didn't cause damage to her stomach. I just need you to tell them that you did do them [sic] things. You are a man, you can handle jail alot [sic] better than I can. I sat in here for [seven] months being innocent. I can't do it anymore I tried to not involve you in this knowing you are innocent as well but you promised me you wouldn't let me go down for this. I don't think we are ever going to know the truth and thats [sic] all we ask for. I am

- 3 -

not trying to just blame you and move on with my life. I am going to stay by your side 100% of the time just as you did me! I know that the way they set this case everything negative that they aren't going to let me walk away. My kids need me, I can't live my life without them. I love you and won't live without you also. This is a messed up mess and I don't know if you saying them [*sic*] things are going to help at all. [T]hey are trying to hang me. Whoever told Cali what to say is the one that really f\*\*\* me! Nothing she said made any sense nor did any of it happen. I don't know what this next week is going to consist of yet but I wanted to get you this information before it was too late. We will refer to this letter on the phone as the 'lady.' [Y]ou need to get rid of this ASAP and not in our trash. Please think of a story and help me out of this. The timing they are saying was 3-5 days. What happened to her in them [*sic*] days? Nothing besides her puking and stomachache but not getting into trouble. This was really hard for me to write but I don't have any other option right now its this or life gone, maybe both at this point. I love you with all my heart. Please [p]lease help me. Cali said she seen you punch R.R. in the stomach, I think the lawyer is going to ask you about that this week. Just please think about this, and come up with something to get me out of here. I can't do this anymore especially for life. Love you always!"

The letter also contained a phone number followed by the name "Vicky."

¶ 8 Richard testified he felt "hurt" and "devastated" by the letter. He was also "shocked" and did not know what to say. Richard agreed that while he was in the car with defendant, she never threatened him, suggested that he lie on the stand, or asked him to help Cynthia. He acknowledged that, several times, he asked defendant what he should do, and

defendant responded that she did not know.

¶ 9        When Richard left the meeting with defendant, he took the letter with him and called his godmother, Rhonda Johnson. He drove to meet Johnson in Champaign, Illinois, and cried while discussing the letter with her. Johnson testified and described Richard as being "a little bit hysterical" or "upset" about the letter when they spoke on the phone. When she saw Richard in person, he appeared disheveled and looked like he had been crying.

¶ 10       On Monday, November 18, 2019, Richard and Johnson appeared at the courthouse where Cynthia's trial was being conducted. They turned the letter over to the police, and Richard submitted to an interview. Police officers Kendra Derosa and Joseph Gossmeyer, both of whom investigated Rica's murder, were also involved with investigating the letter. Gossmeyer interviewed Richard while Derosa watched from an interview room. Derosa described Richard as appearing "pretty *** shaken up" or "frantic" and stated that he did not "seem like his laid-back, kind of easygoing self." Further, Derosa testified that the investigation into Rica's death showed that Rica suffered extensive physical abuse and that her cause of death was blunt force trauma to her abdomen.

¶ 11       Gossmeyer testified that when he first had contact with Richard on November 18, Richard "seemed to be upset and nervous" and did not have the same "laid back" demeanor that he had in the past. He also testified that as part of his investigation, he monitored Cynthia's jail calls, many of which were made to defendant. The State submitted recordings of six phone calls Cynthia made to defendant on November 16 and 17, 2019. The recordings were admitted into evidence and played for the jury.

¶ 12       Four of the recorded calls occurred on November 16, 2019, prior to defendant's meeting with Richard at approximately 1:15 p.m. that afternoon. In the first call, at 12:41 p.m.,

Cynthia asked defendant if anybody had tried to call her or if she had received any messages. Defendant indicated that she had not and asked, "am I supposed to be getting a message from somebody?" Cynthia responded, "I don't know" but stated she did not want defendant to leave town. She also indicated that she knew someone would get a hold of defendant and that it "should be before 1 o'clock."

¶ 13 The second call occurred several minutes later at 12:49 p.m. Cynthia asked defendant if she had heard "anything." Defendant stated she had not, and Cynthia asked her to call a number and say, "Mar said *** she wanted [defendant] to check on her." Defendant responded, "Oh my gosh, it's one of those things, Cynthia?" When Cynthia did not respond, defendant stated, "Go for it" and Cynthia provided the number. Cynthia also directed defendant to say that "this is Vicki and I'm calling for Mary. Mary wanted to check on you."

¶ 14 In the third call, at 12:58 p.m., defendant reported that she had made the call but there had been no answer. Cynthia stated she wanted defendant to "try again" before she left town. Defendant then reported that she was at Cynthia's house and the two discussed a mail notification that had been left at the residence for a "large envelope" that required a signature for delivery. Following that conversation, Cynthia told defendant to "call again" and if the person did not answer, to send a text. After further discussion about the large envelope, and defendant spotting a United States Postal Service van in the area, Cynthia emphasized that the call she wanted defendant to make was "important" and "not just a fun and game call."

¶ 15 In the fourth call, at 1:10 p.m., Cynthia asked defendant, "Did you get it?" Defendant responded that she had not but was "trying right now" and that she was "trying to find the mail truck." Cynthia then asked, "Did she answer?" Defendant responded that the person had answered but stated she was busy and that she would call defendant back. Defendant stated she

was "trying to figure everything out right now." Cynthia asked, "Are you just gonna take that home with you then?" Defendant responded, "We'll figure it out."

¶ 16        The fifth call introduced by the State was made by Cynthia to defendant at 4:43 p.m. on November 16, 2019. During that call, Cynthia and defendant discussed that defendant had been unable to get "that thing from the mail." Cynthia inquired whether defendant "got everything done," and defendant responded, "everything's done." Cynthia then asked if defendant took "that lady" home with her. Defendant responded, "Yeah, she's all set and ready to go." Cynthia asked, "ready to go where" and defendant stated, "I took her home, she's okay."

¶ 17        The final call introduced into evidence occurred the following day. In that call, defendant asked Cynthia if she remembered talking to a "lady" at Walmart and questioned whether Cynthia thought the lady "was trying to tell [defendant] something." Cynthia ultimately told defendant "no."

¶ 18        Defendant testified on her own behalf. She stated Cynthia was her older sister and that she had known Richard for five or six years. She described Richard as being like a brother to her and stated their close relationship continued even after Cynthia was arrested and incarcerated.

¶ 19        Defendant acknowledged picking up the letter from Hollings. She stated she did not know Hollings and that Cynthia had given her Hollings's number. Defendant stated she called Hollings and Hollings returned her call. After defendant retrieved the letter, she stopped at a stop sign and read a portion of the letter that stated, "You did kick her. You did punch her. You did slam her head against the wall." At that time, defendant realized the letter was not for her. She called Richard because she "wanted answers" about why the letter said the things she had read.

¶ 20        Defendant agreed that she and Richard were in the car together for approximately 50 minutes. She asserted they passed the letter back and forth and Richard kept asking her what

they should do. Defendant asserted she told Richard she did not know. Richard kept the letter after their meeting. Defendant acknowledged that during one of her phone calls with Cynthia, Cynthia asked if she "took the lady home." Defendant understood that Cynthia was asking whether she took the letter home. Defendant stated she lied to Cynthia and told her she kept the letter because she was at a football game, she wanted to get off the phone, and she "didn't really want to talk about it." Defendant maintained she only became aware that the letter was supposed to be referred to as the "lady" when she and Richard were passing the letter back and forth in her car. She asserted she had no knowledge of the letter prior to November 16 and denied that anyone ever instructed her to deliver the letter to Richard.

¶ 21    Defendant further testified that it was common for her and Cynthia to speak on the phone multiple times a day. She asserted that during her phone calls with Cynthia on November 16, she "had no clue" what Cynthia was talking about when Cynthia asked if she had received any phone messages. Defendant recalled asking Cynthia during one of those calls if Cynthia was talking about "one of those things." She explained that she thought Cynthia was having her "pick up a Link card," which jail inmates would sometimes sell "to have money for themselves in jail." Defendant testified Richard had picked up a Link card for Cynthia before and she thought that was what Cynthia was asking her to do. Defendant stated the discussions she had with Cynthia about the "large envelope" concerned "the appeal for [Cynthia and Richard's] kids." Defendant noted the children had been removed from her home by the Illinois Department of Children and Family Services and Richard was appealing that action.

¶ 22    Defendant also asserted that she was not concerned when Cynthia asked her about whether she received messages or directed her to call a particular number. She stated the jail's phone system required an account to be set up between the caller and the recipient of the call and

- 8 -

that there had to be money put on the account. According to defendant, Cynthia would have her call people all the time and ask them to "put money on" an inmate's "books" so that the inmate could make phone calls.

¶ 23      On cross-examination, defendant testified Cynthia was her biological sister and they had always been close. While Cynthia was in jail and awaiting trial, the two spoke on the phone hundreds of times, often multiple times per day. Defendant stated she was present during Cynthia's murder trial to show her support and was also a potential witness in the case. She acknowledged being aware that Cynthia's defense was set to begin presenting evidence on Monday, November 18, 2019. Further, she was aware of the possibility that Richard might testify as a witness.

¶ 24      Defendant agreed that during her phone conversations with Cynthia on November 16, she believed Cynthia was directing her to pick up a Link card to give to Richard. She testified she "was going to do it," although she knew that it was "wrong" to do so. Defendant stated she was "being secretive" in her phone conversations with Cynthia because she thought they were discussing "a Link card that they were buying on the streets" and she was concerned that the police would listen to the call. Defendant further acknowledged that she volunteered to keep calling the number Cynthia gave her after she received no answer the first time. She testified she was willing to do what Cynthia wanted even though she thought it might be illegal.

¶ 25      Defendant asserted that after obtaining the letter, she initially assumed it was for her. She agreed that once she read a portion of the letter, she realized it was not for her and that Cynthia wanted her to get the letter to Richard. She specified that the portion of the letter that she read stated as follows: "I know the timing isn't right, but you did kick her and that may have caused damage. You slammed her head against the door and made her head bleed. And when you were

hitting her in the stomach and the chest, that could have caused damage." Defendant further agreed that she realized delivering the letter to Richard was "inappropriate." She acknowledged that she did not take any action "to correct the situation."

¶ 26        Finally, defendant asserted she did not become aware that witnesses in the case were not supposed to communicate about testimony "until after" she gave the letter to Richard. However, she did know and understand "that family members who were in the courtroom [during Cynthia's trial] were not allowed to tell [her] what was going on in the courtroom."

¶ 27        The record reflects the jury received the following instruction as to the charged offense:

> "A person commits the offense of harassment of a witness when he, with the intent to harass or annoy one who may be expected to serve as a witness in a pending legal proceeding, because of the potential testimony of the witness, communicates directly or indirectly with the witness in such a manner as to produce mental anguish or emotional distress."

The jury was also provided with the following definition of legal accountability:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."

Finally, the jury was instructed that to sustain the charge of harassment of a witness in the present case, the State had to prove the following:

> "*First Proposition:* That the defendant, or one for whose conduct he is

legally responsible, communicated directly or indirectly with Richard ***; and

>*Second Proposition:* That Richard *** was expected to serve as a witness in a pending legal proceeding; and

>*Third Proposition:* That the defendant, or one for whose conduct he is legally responsible, made the communication with the intent to harass or annoy Richard *** because of the testimony of Richard ***; and

>*Fourth Proposition:* That the communication produced mental anguish or emotional distress to Richard ***.”

¶ 28 During the jury's deliberations in the case, the jurors sent a note to the trial court, asking the following question: “Does the defendant have to know that the intention of the letter was to annoy or harass?” The court inquired of the parties' positions with respect to the question, and the State proposed that the court instruct jurors “to refer to the jury instructions that they have already received.” Defendant's counsel similarly requested that jurors be told they had “all of the instructions that are required or necessary in the case.” The court then proposed the following response: “You have received the set of instructions containing the law that applies to this case. Refer to those instructions.” Both parties agreed that the court's proposed response was acceptable, and it was provided to the jury.

¶ 29 Ultimately, the jury found defendant guilty of the charged offense. In October 2021, defendant filed a posttrial motion for a judgment notwithstanding the verdict or a new trial. She argued the evidence in the case was insufficient to prove her guilt beyond a reasonable doubt, the trial court erred by sustaining the State's objections to certain witness testimony on the basis of hearsay, and Johnson was improperly permitted to testify in violation of a court order that excluded witnesses from the courtroom during the trial. In November 2021, the court denied defendant's

posttrial motion and sentenced her to 120 days in jail and 30 months' probation.

¶ 30       This appeal followed.

¶ 31                                II. ANALYSIS

¶ 32                          A. Sufficiency of the Evidence

¶ 33       On appeal, defendant first challenges the sufficiency of the evidence. She contends the State failed to prove beyond a reasonable doubt that she intended to promote or facilitate Cynthia's commission of a crime.

¶ 34       "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "Where the defendant challenges the sufficiency of the evidence used to convict him, the reviewing court must determine, considering the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements met beyond a reasonable doubt." *People v. Swenson*, 2020 IL 124688, ¶ 35, 181 N.E.3d 116. "All reasonable inferences are drawn in favor of a finding of guilt," and a conviction will be set aside "only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 35       Additionally, when a challenge to the sufficiency of the evidence is presented, a reviewing court does not retry the defendant. *Id.* It is the trier of fact who "determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence." *Id.* ¶ 36. A trier of fact's credibility determinations are entitled to great weight. *Id.*

¶ 36       Initially, we note defendant suggests that a challenge to the sufficiency of the evidence presents a question of law, which is subject to a *de novo* standard of review. However, as argued by the State, the issue presented on appeal is one of fact—whether the State's evidence

supports each element of the charged offense and, in particular, whether the facts presented support an inference that defendant acted with the requisite intent. "Even if the facts are not disputed, if reasonable persons could draw different inferences from them, it is left to the trier of fact to resolve those questions." (Internal quotation marks omitted.) *People v. Canizalez-Cardena*, 2012 IL App (4th) 110720, ¶ 12, 979 N.E.2d 1014. As indicated above, "[t]he usual standard of review in a criminal case is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* In this instance, we apply the usual standard of review and decline defendant's invitation to review her claim *de novo*.

¶ 37    As charged in this case, harassment of a witness occurs when (1) the defendant communicates directly or indirectly with a person, (2) that person is someone who may be expected to serve as a witness in a pending legal proceeding, (3) the defendant has the intent to harass or annoy the person because of his or her potential testimony, and (4) the communication is done "in such manner as to produce mental anguish or emotional distress." 720 ILCS 5/32-4a(a)(2) (West 2018). Additionally, here, defendant was charged under a theory of accountability. The Illinois accountability statute provides that a person may be held legally accountable for the conduct of another when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." *Id.* § 5-2(c).

¶ 38    To prove "that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13, 6 N.E.3d 145; see also *People v. Phillips*, 2014 IL App (4th) 120695, ¶ 46, 14 N.E.3d 1

(stating "accountability cases fall into two distinct categories: (1) shared-intent cases and (2) common-design cases"). Unlike with shared-intent cases (sometimes referred to as specific-intent cases), in a common-design case, "the State need not prove that the defendant and the principal shared the same intent vis-à-vis the charged crime." *Phillips*, 2014 IL App (4th) 120695, ¶ 43. "Instead, *** the State need only prove the accused had the specific intent to promote or facilitate *a* crime." (Emphasis in original and internal quotation marks omitted.) *Id.* Further, with respect to common-design cases, our supreme court has stated the following:

> "Under the common-design rule, if two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts. [Citation.] Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." (Internal quotation marks omitted.) *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 39       Here, defendant argues that, at trial, the State pursued only a shared-intent theory of accountability, not the common-design theory. Additionally, she contends the evidence presented did not support a finding of her guilt based upon either theory. The State responds, arguing the prosecution did not limit its case to only a shared-intent theory at trial and the evidence was sufficient to support defendant's conviction under both theories. We agree with the State.

¶ 40                                1. *Theories Pursued at Trial*

¶ 41       In arguing that the State asserted only a shared-intent theory of accountability at trial, defendant primarily relies on the prosecution's closing argument. She contends the prosecutor

- 14 -

never referred to her as having a "common criminal design" or asserted that she "voluntarily attached herself to a group bent on illegal acts." Instead, defendant maintains the State made arguments indicative of only the shared-intent theory by asserting that she "shared" or "adopted" Cynthia's criminal intent when she read a portion of the letter, repeatedly mentioning her criminal intent as an element that it had to prove, and arguing that she intended to pressure Richard into concocting a story to get Cynthia out of jail.

¶ 42        Initially, we note that no matter the theory of accountability pursued, the State had to show that defendant had "the intent to promote or facilitate" a crime. 720 ILCS 5/5-2(c) (West 2018); *Fernandez*, 2014 IL 115527, ¶ 13. Thus, assertions by the prosecutor that an element of the offense the State had to prove was defendant's criminal intent when she communicated with Richard were not exclusive to either accountability theory.

¶ 43        Additionally, although the prosecutor did not explicitly reference the "common design" theory by name, he did argue that defendant cooperated with Cynthia's "scheme," and his arguments were otherwise inclusive of such a theory. The prosecutor asserted a showing of defendant's intent could be made by circumstantial evidence and further argued as follows:

> "Here using your common sense it is clear that Cynthia's intent was to get this letter out of the jail to [defendant] out in the real world without police getting tipped off and deliver this letter to Richard in the middle of a trial for his daughter's murder in order to pressure him to change his testimony or to testify in a certain way. *** [Defendant] adopted this intent when she aided in facilitating this offense by delivering the letter. And their goal, [Cynthia's] initial goal and the goal of [defendant] when she joined in this scheme was to apply emotional pressure to Richard so intently that Richard would finally agree to make up a story or to lie for

- 15 -

[Cynthia]. *** All of those statements in this letter are designed initially by [Cynthia] to apply maximum emotional pressure to Richard in this important moment of the trial. That is intent to harass. And [defendant] is just as criminally accountable for delivering that message to Richard as [Cynthia] is for writing it."

In his rebuttal argument, the prosecutor also argued that defendant was "willing to act as [Cynthia's] accomplice, whatever that task might be," and he told the jury that, "in Illinois if you choose to help someone commit a crime, you are equally responsible for that conduct as long as you have the intent to help them commit that crime."

¶ 44         Again, "[e]vidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." (Internal quotation marks omitted.) *Fernandez*, 2014 IL 115527, ¶ 13. Viewing the prosecutor's comments as a whole, the record does not support defendant's contention that the State limited its case to only the shared-intent theory of accountability.

¶ 45         Further, the jury received the accountability instruction from the Illinois Pattern Jury Instructions, which states as follows:

"A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of [(an) (the)] offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of [(an) (the)] offense.

[The word 'conduct' includes any criminal act done in furtherance of the planned and intended act.]" Illinois Pattern Jury Instructions, Criminal, No. 5.03

- 16 -

(approved Oct. 28, 2016) (hereinafter IPI Criminal No. 5.03).

The Committee Note to IPI Criminal No. 5.03 instructs that the bracketed word "an" and the bracketed paragraph should be used "when the offense is different than the planned and intended offense but done in furtherance of it" and cites cases referencing the common-design theory. Here, the instruction to the jury used the bracketed word "the" and not the bracketed paragraph. Ultimately, however, the instruction does not explicitly distinguish between the two types of accountability. See *People v. Walls*, 2022 IL App (1st) 200167, ¶ 49 n.3 (noting "there is only one accountability instruction available and it does not directly distinguish between specific intent and common design accountability"). Additionally, for a common-design theory to apply, it is not necessarily required that the group to which the defendant attaches herself plans and intends to commit a specific offense other than the one for which the State seeks to hold the defendant accountable. Rather, "all that is required for a defendant to be legally accountable in a common-design case is for the evidence to show that (1) the group was intending to engage in some form of criminal behavior and (2) the defendant was aware of the group's intentions." *People v. Jackson*, 2020 IL App (4th) 170036, ¶ 49, 165 N.E.3d 523.

¶ 46          Accordingly, contrary to defendant's suggestion on appeal, we find the jury was not precluded from finding defendant guilty of the charged offense based on the common-design theory of accountability.

¶ 47                    2. *Common-Design Theory and Sufficiency of the Evidence*

¶ 48          Defendant also argues the common-design theory was not supported by the evidence because there was no showing that she and Cynthia planned or agreed to commit a crime or that she attached herself to a group bent on illegal acts, with knowledge of its design. We disagree.

¶ 49        "[C]ommon-design cases focus on whether a defendant was part of [a group bent on illegal acts] and not on whether the defendant intended for any particular crime to occur." *Id.* ¶ 45. "A defendant's 'intent' to commit any specific crime is not relevant ***." *Id.* "Instead, '[e]vidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design *supports an inference* that he shared the common purpose and *will sustain his conviction for an offense committed by another*.' " (Emphases in original.) *Id.* (quoting *Fernandez*, 2014 IL 115527, ¶ 13). A group may consist of only two people, one of whom is the defendant. *Id.* ¶ 53. Further, we have stated that the phrase "with knowledge of its design," "means only that a person who attached himself to a group knew that the group intended to engage in criminal behavior of some kind" and "nothing more specific is required." *Id.* ¶ 49.

¶ 50        Additionally, "[a] defendant's mental state is ordinarily proved circumstantially by inferences reasonably drawn from the evidence." (Internal quotation marks omitted.) *People v. Grimes*, 386 Ill. App. 3d 448, 455, 898 N.E.2d 768, 775 (2008). "Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense." *People v. Perez*, 189 Ill. 2d 254, 266, 725 N.E.2d 1258, 1265 (2000).

¶ 51        Here, evidence showed Cynthia was on trial for the murder of Richard's eight-year-old daughter, Rica. There is no dispute that Richard was a potential witness at Cynthia's trial or that that fact was known by both Cynthia and defendant. While Cynthia's trial was ongoing and while Richard was still a potential witness, defendant delivered a letter to Richard from Cynthia in which Cynthia threatened suicide, asked Richard to lie on the witness stand, and accused him of not only physically abusing Rica but suggested he could have caused her fatal injury. Defendant does not dispute that Cynthia intended to harass or annoy Richard or that the letter caused Richard mental anguish or emotional distress.

¶ 52 Specifically relevant to the theory of common design, the record shows that on November 16, 2019, prior to defendant's delivery of the letter to Richard, defendant engaged in a series of phone conversations with Cynthia. During those conversations, Cynthia spoke cryptically about a communication defendant was supposed to receive that day. She directed defendant on how to receive that communication, and defendant agreed to follow Cynthia's direction even though she believed it pertained to an illegal activity. Once defendant received the letter, she read at least a portion of it. As the State points out, the jury was not required to accept defendant's self-serving testimony that she only read a small portion of the letter. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 229, 920 N.E.2d 233, 243 (2009) ("[T]he trier of fact is not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt."); see also *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 82, 996 N.E.2d 1227 (stating "the jury was not required to believe [the] defendant's testimony regarding either why he behaved as he did or what his intent was"). However, even if the jury did accept that testimony, the portion defendant admittedly read would have informed her that Cynthia was attempting to (1) communicate with Richard about the pending murder case at which defendant knew Richard was a potential witness and (2) possibly shift the blame for the murder onto him.

¶ 53 When the evidence presented is viewed in the light most favorable to the State, a reasonable inference exists that defendant knew Cynthia "intended to engage in criminal behavior of some kind." *Jackson*, 2020 IL App (4th) 170036, ¶ 49. This is so, not only because of the content of the letter itself (a portion of which defendant was admittedly aware of), but also Cynthia's behavior during her phone conversations with defendant and her actions in sneaking the letter out of the jail instead of sending it directly to defendant or Richard. Defendant acknowledged that, after reading part of the letter, she knew that Cynthia intended for her to give it to Richard and

defendant aided Cynthia by completing that task. Ultimately, defendant voluntarily attached herself to Cynthia, a person bent on an illegal act, with knowledge that Cynthia intended to engage in some type of criminal behavior. This was sufficient to support an inference that defendant and Cynthia shared a common purpose and to sustain defendant's conviction for harassment of a witness.

¶ 54                            3. *Shared-Intent Theory and Sufficiency of the Evidence*

¶ 55            Defendant further maintains that a finding of guilt based on a shared-intent theory of accountability was not supported by the evidence. In particular, she contends the State failed to show she had knowledge of Cynthia's intentions to harass or annoy Richard, and thus, she was unaware of the crime. Defendant argues she did not know about the letter until she obtained it, never fully read the letter to obtain knowledge of its contents, and acted in a manner inconsistent with a shared criminal intent because she did not verbally pressure Richard regarding his testimony and allowed him to keep the letter "in defiance of Cynthia's wishes."

¶ 56            Again, "[i]ntent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense." *Perez*, 189 Ill. 2d at 266. Here, the jury could have reasonably inferred that defendant had the specific intent to annoy or harass Richard when she delivered Cynthia's letter to him. Evidence showed defendant had a close relationship with Cynthia. She exhibited a desire to help Cynthia and supported her following her arrest. After obtaining the letter, defendant read at least a portion of it that accused Richard, who defendant knew might testify at Cynthia's murder trial, of physically abusing his daughter, the murder victim. It suggested the possibility that Richard, rather than Cynthia, caused the injury that resulted in Rica's death. Just the portion of the letter defendant admitted to reading would have been sufficient to annoy or harass Richard to the extent it produced mental anguish or emotional

distress. As argued by the State, "[t]he defendant is presumed to intend the natural and probable consequences of his acts." (Internal quotation marks omitted.) *People v. Foster*, 168 Ill. 2d 465, 484, 660 N.E.2d 951, 960 (1995). Additionally, after defendant delivered the letter to Richard, she continued to conceal its existence, and its delivery, by speaking about it in code. Specifically, as directed by Cynthia, defendant referred to the letter as the "lady" when talking to Cynthia on the phone.

¶ 57 As stated, defendant argues her actions were inconsistent with a shared criminal intent because she did not verbally pressure Richard regarding his testimony and allowed him to keep the letter "in defiance of Cynthia's wishes." First, although the evidence does not show that defendant verbally asked Richard to lie for Cynthia or, aside from giving him the letter, pressured Richard about his testimony, it also does not show that defendant exhibited any rejection of the letter. Behavior inconsistent with Cynthia's criminal intent would have been a refusal to deliver the letter in the first instance or recommendations to Richard that he ignore the letter, turn the letter over to the police, or provide only truthful testimony in the event he was called as a witness. Second, the evidence does not support a finding that defendant defied any of Cynthia's wishes with respect to the letter. The letter itself indicated Richard was to keep the letter and directed him, not defendant, to destroy it.

¶ 58 For the reasons stated, we find the evidence, when viewed in the light most favorable to the State, was sufficient to establish defendant's intent to promote or facilitate a crime beyond a reasonable doubt. Accordingly, defendant's challenge to the sufficiency of the evidence lacks merit.

¶ 59 B. Jury Question

¶ 60 On appeal, defendant next argues the trial court abused its discretion with respect

to the manner in which it responded to the jury's question during its deliberations. She acknowledges that she did not object to the response the court provided but contends we may review the alleged error under the plain-error doctrine or because her counsel was ineffective.

¶ 61   Initially, we find the plain-error doctrine is inapplicable to defendant's claim. The plain-error doctrine provides that a reviewing court may consider unpreserved errors if "a clear or obvious error occurred" and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Birge*, 2021 IL 125644, ¶ 24, 182 N.E.3d 608. However, the plain-error doctrine applies only to cases involving forfeiture, not affirmative acquiescence, or waiver. *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 29, 92 N.E.3d 494. "When defense counsel affirmatively acquiesces to actions taken by the trial court, any potential claim of error on appeal is waived, and a defendant's only available challenge is to claim he received ineffective assistance of counsel." *Id.*; see also *People v. Reid*, 136 Ill. 2d 27, 38, 554 N.E.2d 174, 179 (1990) ("Where a defendant acquiesces in the circuit court's answer to the jury's question, the defendant cannot later complain that the circuit court abused its discretion.").

¶ 62   Additionally, "[u]nder the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319, 802 N.E.2d 1185, 1190 (2003). Where a defendant's counsel has specifically asked the trial court to proceed in a particular manner, "[t]he doctrine of invited error blocks [the] defendant from raising th[e] issue on appeal, absent ineffective assistance of counsel." *People v. Henderson*, 2017 IL App (1st) 142259, ¶ 210, 77 N.E.3d 1046; *People v. Patrick*, 233 Ill. 2d 62, 77, 908 N.E.2d 1, 10 (2009) (declining to address the defendant's plain-

error claim because the defendant invited the error).

¶ 63     Here, during deliberations, the jury sent a note, asking the trial court the following question: "Does the defendant have to know that the intention of the letter was to annoy or harass?" The court responded with the following: "You have received the set of instructions containing the law that applies to this case. Refer to those instructions." In this instance, not only did defendant's counsel affirmatively acquiesce to the trial court's specific response to the jury, but her counsel also invited the court's response. The record shows that after the court received the jury's question, it asked both parties to weigh in on how to respond. Both the State and defendant's counsel proposed similar responses, which informed the jury to refer to the instructions that they already received. The court then proposed a response in accordance with the parties' wishes, which both parties found acceptable. Given these circumstances, defendant cannot argue plain error.

¶ 64     As noted, defendant also contends her counsel was ineffective for failing to raise an objection to the trial court's response. "To establish ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient and (2) prejudice resulted from that deficiency." *People v. Eubanks*, 2021 IL 126271, ¶ 30, 190 N.E.3d 177 (citing *Strickland v. Washington*, 466 U.S. 668, 681, 691-92 (1984)). This claim remains available to defendant, and we consider its merits.

¶ 65     "Generally, a trial court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *People v. Averett*, 237 Ill. 2d 1, 24, 927 N.E.2d 1191, 1204 (2010). However, "under the appropriate circumstances, a circuit court may exercise its discretion to refrain from answering a jury's inquiries." (Internal quotation marks omitted.) *Reid*, 136 Ill. 2d at 39. Appropriate circumstances include when (1) the jury instructions are readily understandable and sufficiently

explain the relevant law, (2) further instructions would serve no useful purpose or could mislead the jury, (3) the jury's inquiry involves a question of fact, or (4) the court's answer would cause it to express an opinion that would likely direct a verdict one way or the other. *Id.*

¶ 66 In this instance, defendant contends the trial court should have answered the jury's question in the affirmative because the jury exhibited confusion and the "chief contested issue" in the case was whether she "shared [Cynthia's] criminal intent to harass or annoy Richard." She argues the court should have informed the jury that "in order to intentionally facilitate or promote the crime of harassment of a witness, the defendant must know that the intent of the letter was to harass or annoy."

¶ 67 Here, the record indicates defendant's jury received proper instructions, including IPI Criminal No. 5.03, which sets forth the definition of legal accountability. Moreover, as the State points out, defendant's proposed response on appeal is only accurate with respect to a shared-intent theory of accountability and would have excluded the jury's consideration of a common-design theory. Again, "[a] defendant's 'intent' to commit any specific crime is not relevant" in a common-design case. *Jackson*, 2020 IL App (4th) 170036, ¶ 45. For the reasons already stated, both accountability theories were applicable in the case at bar and supported by the evidence. Defense counsel's performance was not deficient for failing to propose a response that would have misstated the law applicable to defendant's case, and we find her ineffective-assistance claim lacks merit.

¶ 68 C. Prosecutorial Error

¶ 69 On appeal, defendant further argues that comments made by the prosecutor during his closing argument and rebuttal denied her a fair trial. Specifically, she contends the prosecutor misstated the law of accountability and argued facts not in evidence. Again, defendant

acknowledges that she forfeited this issue by failing to raise it with the trial court. Nevertheless, she contends the alleged error is reviewable under the plain error doctrine or because her counsel was ineffective for failing to object.

¶ 70 "Generally, prosecutors have wide latitude in the content of their closing arguments." *People v. Jackson*, 2020 IL 124112, ¶ 82, 162 N.E.3d 223. "They may comment on the evidence and on any fair and reasonable inference the evidence may yield." *People v. Runge*, 234 Ill. 2d 68, 142, 917 N.E.2d 940, 982 (2009). "[A]n attorney may not misstate the law in closing argument." *People v. Ramsey*, 239 Ill. 2d 342, 441, 942 N.E.2d 1168, 1223 (2010). Further, "[r]eviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks, and will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Runge*, 234 Ill. 2d at 142.

¶ 71                                     1. *Misstatements of Law*

¶ 72 Defendant argues the prosecutor misstated the law of accountability during his closing argument. She contends he "argued that [her] mere act of delivering the letter to Richard rendered her accountable for Cynthia's crime," improperly analogized her conduct to that of a getaway driver for a bank robbery, and "distorted the concept of 'intent' to mean a general intent to help, rather than a specific intent to harass or annoy."

¶ 73 Here, we are not persuaded by defendant's argument. Initially, as noted by the State, defendant's allegations of error rely heavily on her erroneous belief that only the shared-intent theory of accountability was at issue in her case. For the reasons already stated, defendant's position is incorrect and the prosecutor was not limited to arguing that, to find defendant guilty, the jury had to determine that she shared Cynthia's specific criminal intent to harass or annoy

Richard.

¶ 74        Further, we agree with the State that when considered as a whole, the prosecutor's comments were "a proper commentary on common design principles necessary for accountability." The record shows the prosecutor referenced the definition of legal accountability, noted that defendant's intent could be shown by circumstantial evidence, presented argument regarding Cynthia's criminal intent in writing the letter, described the contents of the letter and argued it was designed to apply emotional pressure to Richard, and referred to defendant as having "adopted" Cynthia's intent and "joined" in her "scheme." After defendant's counsel presented argument that defendant lacked "knowledge" and could not be guilty simply because she delivered the letter, the prosecutor asserted during his rebuttal argument that "if you choose to help someone commit a crime, you are equally responsible for that conduct as long as you have the intent to help them commit that crime." He further argued that intent could "be formed in a second" and that defendant could have formed the intent to aid Cynthia with the "offense" when she began to read the letter.

¶ 75        We reject defendant's assertion that the prosecutor's comments misstated the law of accountability. Because we find no error, defendant cannot establish either the occurrence of plain error or ineffective assistance of counsel.

¶ 76                    2. *Arguing Facts Not in Evidence*

¶ 77        Defendant also asserts that during his rebuttal argument, the prosecutor impermissibly argued facts not in evidence. She contends the prosecutor improperly implied that she incriminated herself during phone calls and in text messages that the State had not been able to introduce at trial. Defendant specifically challenges the following comments by the prosecutor:

      "I would also ask you to keep in mind that you have only received six jail calls into

evidence and zero text messages in evidence. You heard the Court sustaining various objections to different things that [defense counsel] was trying to offer. You have a duty as jurors to not speculate about matters that are not in evidence. [Defense counsel] knows, as the State knows, as the Judge knows, that the State is constrained in what we are able to present to you based on enumerable [*sic*] rules that we have to follow as lawyers. Your rule is that you are not permitted to speculate about matters that are not in evidence. So I would ask you to disregard those arguments because you have no idea what is or is not in those text messages or jail calls that were not presented in Court. And if a fellow juror attempts to bring that up, I would ask you to stop them because you are prohibited from speculating or discussing items that are not in evidence in this case."

¶ 78 Here, as the State points out, during closing arguments, "[t]he prosecutor may *** respond to comments by defense counsel which clearly invite a response." *People v. Hudson*, 157 Ill. 2d 401, 441, 626 N.E.2d 161, 178 (1993); see also *People v. McKinley*, 242 Ill. App. 3d 124, 133, 609 N.E.2d 720, 725 (1992) ("Where the complained-of remarks are within the rebuttal argument, they will not be held improper if they appear to have been provoked or invited by the defense counsel's argument."). In this instance, the prosecutor's challenged comments in rebuttal were made in response to arguments from defendant's counsel that investigators in the case looked at hundreds of phone calls and thousands of other communications involving defendant, and if those calls and communications had contained incriminating evidence, the Sate "would have presented it." Additionally, the clear import of the prosecutor's response was that the jury should not speculate on the contents of those communications, not that those communications were incriminating. Ultimately, we are not persuaded by defendant's assertion that the prosecutor was

- 27 -

arguing facts not in evidence when he made the challenged remarks.

¶ 79          Further, even assuming that the challenged portion of the prosecutor's argument was improper, defendant cannot demonstrate either plain error or ineffective assistance of counsel. Reversible error occurs if a prosecutor's remarks "constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Id.* In this case, the challenged comments made up only a brief portion of the prosecutor's argument to the jury, and we cannot say that they constituted a material factor in defendant's conviction or that they deprived her of a fair trial. Accordingly, we find neither the occurrence of reversible error nor plain error. *People v. Smith*, 2016 IL 119659, ¶ 39, 76 N.E.3d 1251 ("In applying the plain error doctrine, it is first appropriate to determine whether error occurred, because absent reversible error, there can be no plain error."). For the same reasons, defendant cannot establish the prejudice prong of her ineffective-assistance claim.

¶ 80                              D. Assessment Waiver

¶ 81          Finally, on appeal, defendant argues her attorney was ineffective for failing to file an assessment waiver on her behalf pursuant to section 124A-20 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) (725 ILCS 5/124A-20 (West 2020)). She contends that, as part of her sentence, she was ordered to pay more than $2500 in various court assessments. However, because she is indigent, she was entitled to a waiver to exempt her from paying.

¶ 82          Section 124A-20(b) of the Code of Criminal Procedure provides that a defendant may apply for an assessment waiver no later than 30 days after his or her sentencing. *Id.* § 124A-20(b). "If the court finds that the applicant is an indigent person, the court shall grant the applicant

a full assessment waiver exempting him or her from the payment of any assessments." *Id.* § 124A-20(b)(1). Section 124A-20(a) provides the following definition of "indigent person":

" 'Indigent person' means any person who meets one or more of the following criteria:

(1) He or she is receiving assistance under one or more of the following means-based governmental public benefits programs: Supplemental Security Income; Aid to the Aged, Blind and Disabled; Temporary Assistance for Needy Families; Supplemental Nutrition Assistance Program; General Assistance; Transitional Assistance; or State Children and Family Assistance.

(2) His or her available personal income is 200% or less of the current poverty level, unless the applicant's assets that are not exempt under Part 9 or 10 of Article XII of the Code of Civil Procedure are of a nature and value that the court determines that the applicant is able to pay the assessments.

(3) He or she is, in the discretion of the court, unable to proceed in an action with payment of assessments and whose payment of those assessments would result in substantial hardship to the person or his or her family." *Id.* § 124A-20(a).

¶ 83 Defendant asserts her indigency was evidenced by the appointment of the Office of the State Appellate Defender (OSAD) to represent her on appeal and, as a result, her counsel should have moved for an assessment waiver under section 124A-20(a)(3) because "payment of the assessments would likely result in a substantial hardship for her and her family." Ultimately,

however, defendant has failed to point to any evidence in the record of a "substantial hardship" aside from the mere fact that OSAD was appointed to represent her. Additionally, the documents she cites, setting forth the various fines and costs imposed after her sentencing, show a $5000 cash bond she posted was used to pay the amount she owed in full and that she was entitled to a refund of $2687 for the remaining bond money. See *People v. MacTaggart*, 2019 IL App (3d) 160583, ¶ 15, 151 N.E.3d 667 ("Bond money may be presumed to belong to the defendant *** as to fines, costs, and judgments against him.").

¶ 84       As stated, "[t]o establish ineffective assistance of counsel, a defendant must show *both* that (1) counsel's performance was deficient and (2) prejudice resulted from that deficiency." (Emphasis added.) *Eubanks*, 2021 IL 126271, ¶ 30. Here, defendant has failed to show she was entitled to an assessment waiver and cannot establish the prejudice prong of her ineffective-assistance claim.

¶ 85                                     III. CONCLUSION

¶ 86       For the reasons stated, we affirm the trial court's judgment.

¶ 87       Affirmed.

---

*People v. Baker*, 2022 IL App (4th) 210713

---

| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 19-CF-1268; the Hon. William A. Yoder, Judge, presiding. |
|---|---|

---

| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Elizabeth A. Botti, of State Appellate Defender's Office, of Chicago, for appellant. |
|---|---|

---

**Attorneys**

| | |
|---|---|
| **for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and David E. Mannchen, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |