NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231551-U

NO. 4-23-1551

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 12, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Tazewell County |
| TIFFANY HARRISON, | ) | No. 22CF457 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Christopher R. Doscotch, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed the trial court's judgment, as the evidence was sufficient to uphold defendant's convictions of theft and unlawful possession of the debit card of another.

¶ 2    Following a bench trial, the trial court found defendant, Tiffany Harrison, guilty of theft (720 ILCS 5/16-1(a)(1)(A) (West 2022)) and unlawful possession of the debit card of another (720 ILCS 5/17-32(b) (West 2022)). The court sentenced defendant to 30 months' probation and 150 days in jail. Defendant appeals, arguing that the State failed to present sufficient evidence for her convictions. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND

¶ 4    On August 19, 2022, the State charged defendant with theft of between $500 and $10,000 (720 ILCS 5/16-1(a)(1)(A) (West 2022)) and unlawful possession of the debit card of another (720 ILCS 5/17-32(b) (West 2022)), for possessing and using the debit card of her

boyfriend's mother, Rebecca Allen, from March 2022 to April 2022. The matter proceeded to a bench trial, at which defense counsel conceded that defendant conducted 97 transactions on Rebecca's bank account totaling $20,248.57. The disputed issue was whether the State could prove defendant was unauthorized to conduct those transactions. The State introduced the following evidence.

¶ 5 Due to a stroke, Rebecca suffered from aphasia, which affects memory and communication. When Rebecca's husband passed away in March 2020, her son, Larry Shane Allen (Shane), and defendant, Shane's girlfriend of 13 years, moved in with her to take care of her. Both Shane and his brother, James Sean Allen (Sean), had powers of attorney for financial and medical purposes for Rebecca. Shane and Sean testified that they jointly managed Rebecca's bank account at Citizens Equity First Credit Union (CEFCU)—Shane usually possessed her debit card, as he lived with her, and Sean was otherwise responsible for managing her finances. Sean set up automatic payments for recurring bills and checked the account three or four times a year.

¶ 6 Rebecca's bank account contained life insurance proceeds from her husband's demise—about $20,000—and her Social Security and pension checks, which were about $2600 per month. According to Sean, Rebecca usually spent less than $2600 a month. The family used this account for Rebecca's bills, meals for Rebecca and her family, household necessities, church offerings, and any additional expenses she had; it was also occasionally used to purchase aluminum for Shane's business. The church offerings were usually $100 or $200 every week. At times, Shane would give Rebecca's debit card to Rebecca's best friend or siblings when they went out with her. Similarly, when defendant drove Rebecca somewhere, Shane would give defendant the debit card to purchase food or other necessities, like gas for her car. However, both Shane and Sean testified that they did not give defendant the PIN code to the debit card, which would not have been

necessary for a regular purchase but would have been for an ATM transaction. According to Shane, between November 2021 and April 2022, defendant would take Rebecca somewhere about once or twice a week. He stated that he did not give defendant permission to use the debit card between November 22, 2021, and April 14, 2022, but admitted that Rebecca knew the PIN to her debit card and had the authority to instruct defendant to use it.

¶ 7        In December 2021, Shane became very ill with COVID-19; he was in the hospital for five days and on oxygen for at least two months. During that time, he was essentially bedridden and did not know where Rebecca's debit card was. After he recovered, he attempted to use Rebecca's debit card to pick up dinner for the family but was surprised when the card was declined. When he checked the account balance, which should have been over $20,000, it was negative. He and Sean were both shocked and initially assumed that the account had been hacked because the "reoccurring transactions" of a couple hundred dollars "just seemed a little bit unusual." Sean contacted both the Washington Police Department and CEFCU to report the issue because the charges were uncommon for Rebecca to make. When Shane and Sean discussed it with defendant, she stated that the account must have been hacked and never admitted to using the debit card.

¶ 8        Officer Daniel Foster and Detective Steve Hinken of the Washington Police Department began investigating the issue and discovered that there were dozens of ATM withdrawals from Rebecca's account, some just a minute apart, between November 22, 2021, and April 14, 2022. There were 97 transactions made on 49 days in this five-month period, totaling $20,248.57. Almost all these transactions were cash withdrawals from ATMs at a Casey's gas station and CEFCU, though there were some transactions from Walmart and ATM withdrawals from Beck's. The police obtained Casey's surveillance footage and CEFCU ATM photos showing that defendant made those transactions.

¶ 9 The footage also showed that on multiple occasions, defendant used the cash that she withdrew to purchase lottery tickets, which Shane asserted Rebecca did not buy and would not have instructed defendant to buy. Additionally, Hinken testified that the footage confirmed that defendant was not withdrawing money from her own account, as the time stamps on the surveillance footage matched the time stamps on the withdrawals from Rebecca's bank account. While the police did not obtain defendant's own bank account records, Hinken stated that if defendant had used her own account, the surveillance footage of defendant would not have matched with the time stamps of the withdrawals from Rebecca's account. Hinken also did not see defendant make any motions on the surveillance footage that would have been consistent with making withdrawals from the same ATM using two different cards. However, while the footage and photos did not reveal anyone with defendant, both Foster and Hinken testified that they would not be able to tell from the angle of the footage whether there was someone else in the car with defendant at the time of the transactions.

¶ 10 After the police identified defendant as a suspect, Sean discussed it with defendant, who denied that she had anything to do with it and stated that there was "absolutely no way she would do that" to Rebecca. Sean testified that, at that time, defendant did not say that she had Rebecca's permission to use the debit card.

¶ 11 On August 19, 2022, Hinken located defendant at her workplace, where he gave her *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and interviewed her. Defendant told Hinken that she was aware that someone had accused her of taking up to $20,000 from the account, but she denied withdrawing that amount. She initially stated that she had been given permission to use the card and only withdrew $100 from the account while Rebecca was with her. According to Hinken, defendant changed her story several times, later asserting that she

had withdrawn money from the account multiple times but that Rebecca was with her every time and gave her permission. Defendant stated that some of the surveillance footage showed her withdrawing money from her own account. After concluding the interview, Hinken arrested defendant.

¶ 12 Defendant presented no evidence. The defense theory was that (1) defendant had permission from Rebecca to use the card, (2) Rebecca could have been present during each of these transactions, and (3) defendant could have been making withdrawals from her own bank account.

¶ 13 The trial court found defendant guilty of both offenses. In doing so, it found that (1) Shane and Sean were credible witnesses and (2) defendant was given "permission periodically to use the card," but that "permission to use the card with [Rebecca was] on a periodic basis, [and did] not give [defendant] permission to use the card" for "the amounts here." The court sentenced defendant to 30 months' probation and 150 days in jail and ordered her to pay $12,000 in restitution.

¶ 14 This appeal followed.

¶ 15 II. ANALYSIS

¶ 16 Defendant argues that the evidence at trial was insufficient to support her convictions for theft and unlawful possession of the debit card of another. The State responds that the evidence was sufficient to sustain defendant's convictions.

¶ 17 When a defendant challenges the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. "However, it is not necessary that the trier of fact find each fact in the chain of circumstances beyond a reasonable doubt. Rather, the trier of fact must find only that

the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. In making this finding, "the trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70.

¶ 18     "This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial," and "circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction." *Jackson*, 2020 IL 124112, ¶ 64. It is the function of the trier of fact to determine the credibility of the witnesses, decide the weight to be given to their testimony, resolve conflicts in the evidence, and draw reasonable inferences from that evidence. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 35. The trier of fact's credibility determinations are entitled to great weight. *People v. Swenson*, 2020 IL 124688, ¶ 36. This court will not set a criminal conviction aside "unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 19     To establish theft, the State must show that defendant "exert[ed] unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(1) (West 2022). Here, defendant conceded that she possessed the debit card and made all the transactions identified by the State, so the only contested issue is whether she had permission to do so. Viewing the evidence in the light most favorable to the State, a reasonable trier of fact could have found defendant did not have permission to make these transactions.

¶ 20     We defer to the trial court's finding that Shane and Sean were credible witnesses. Sean testified that the usual spending on Rebecca's account was less than $2600 per month, which was the amount Rebecca received from Social Security and her pension. Sean also stated that the

transactions made between November 2021 and April 2022 were so unusual that the family initially believed the account had been hacked. Additionally, the ATM and store footage showed defendant withdrawing cash from Rebecca's account and immediately purchasing lottery tickets with cash, which Shane testified Rebecca would not have authorized. Moreover, Rebecca was not visible on any of the surveillance footage for any of the 97 transactions made on 49 different days. Defendant's statement that she withdrew money from her own account was belied by the fact that (1) the transactions from Rebecca's account matched the timestamps on the footage showing defendant withdrawing cash and (2) Hinken did not observe her make any motions consistent with switching cards. Defendant's statements to both the Allen family and Hinken were also inconsistent and changed several times.

¶ 21        Based on the foregoing evidence, the most reasonable inference is that defendant was not authorized to conduct debits on Rebecca's account totaling $20,248.57. The trial court is not "required to disregard inferences that flow normally from the evidence before it," nor "search out all possible explanations consistent with innocence." *Jackson*, 2020 IL 124112, ¶ 70. In this case, it was reasonable for the court to infer that defendant made unauthorized withdrawals considering the large amounts withdrawn from Rebecca's account without Rebecca's presence, especially where defendant used those funds to purchase items like lottery tickets that Rebecca would not typically purchase, and defendant's explanations changed repeatedly and were unsupported by the evidence. Accordingly, the evidence is sufficient to uphold defendant's conviction for exerting unauthorized control over Rebecca's property.

¶ 22        Defendant may have had the authority to make *some* purchases for Rebecca during the relevant period, and Rebecca may have given defendant the PIN to the debit card at some point. However, the trial court reasonably found defendant lacked the authority to withdraw at least $500

of the $20,248.57 from Rebecca's account. The card was supposed to be used to purchase household necessities, meals for Rebecca or her family, and church offerings. Defendant notes that Shane had used the card previously for other things, such as aluminum for his business. However, assisting one's son with occasional business expenses is entirely different from buying lottery tickets for a nonrelative. Defendant also argues that the State did not prove beyond a reasonable doubt that she "spent the money for illegitimate things" because it "failed to prove how defendant spent the money" she withdrew. But the State did not have to trace the cash defendant withdrew; rather, the theft statute only requires that the purchases and withdrawals were not authorized. As discussed above, the court reasonably found defendant lacked authority.

¶ 23 Though defendant argues that regular expenses could explain the account being drained between March 2020 and April 2022, we are concerned only with the $20,248.57 withdrawn by defendant from the account between November 2021 and April 2022. In any case, the trial testimony flatly belies this speculation. The usual spending on the account, including church offerings, was less than $2600 a month, according to Sean. Though Sean only checked the account balance three to four times a year, he would have noticed if the account balance was getting lower than usual every quarter. Moreover, the transactions made by defendant only included ATM transactions and Walmart purchases—they did not include regular expenses, such as utility payments. Defendant's primarily cash transactions on Rebecca's account, as reflected in State trial exhibit No. 1, were atypical of Rebecca's spending—$1424 in December, $2762 in January, $3932 in February, $8651 in March, and $3072 in April. The evidence supports the trial court's finding that defendant acted beyond any authority Rebecca gave her.

¶ 24 We also conclude that the evidence was sufficient to support defendant's conviction for unlawful possession of the debit card of another. A person commits this crime when he or she

"receives a credit card or debit card from the person, possession, custody, or control of another without the cardholder's consent or if he or she, with knowledge that it has been so acquired, receives the credit card or debit card with the intent to use it or sell it, or to transfer it to a person other than the issuer or the cardholder." 720 ILCS 5/17-32(b) (West 2022).

Thus, to convict defendant, the State was required to show she (1) received a debit card from Rebecca, (2) without Rebecca's consent, and (3) intended to use the debit card. Here, defendant conceded that she received the debit card and made the transactions identified by the State, so the only contested issue is whether she received the debit card without Rebecca's consent at least once. The testimony presented by the State showed that (1) Shane did not give defendant the PIN to the debit card, (2) Shane did not give defendant permission to use the debit card between November 22, 2021, and April 14, 2022, (3) Shane did not know where the debit card was while he was bedridden, as that was a "murky time" for him, (4) Rebecca was not seen on any of the surveillance videos of defendant withdrawing cash on any of the 49 days that defendant did so, and (5) Rebecca suffered from strokes, aphasia, and memory issues that necessitated her granting powers of attorney to her sons to manage her money and care. While defendant may have occasionally received the debit card with Rebecca's or Shane's consent, the evidence gives rise to the reasonable inference that defendant did not *always* receive the debit card with consent. Viewing the evidence in the light most favorable to the State, it is sufficient to show that defendant received Rebecca's debit card without Rebecca's consent.

¶ 25                                    III. CONCLUSION

¶ 26            For the reasons stated, we affirm the trial court's judgment.

¶ 27            Affirmed.