NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230591-U

NO. 4-23-0591

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 5, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Winnebago County |
| DYLAN RAY MYERS, | ) | No. 20CF652 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

_____

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Lannerd concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The State's evidence was sufficient to prove beyond a reasonable doubt defendant committed first degree murder.

¶ 2    In April 2020, a grand jury indicted defendant, Dylan Ray Myers, on one count of attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2020)) and one count of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West Supp. 2019)). In an October 2020 superseding bill of indictment, the grand jury charged defendant and his codefendant, Harry Warren Lawson Jr., with 18 counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)) for the death of Steven DeLorme. At a June 2021 hearing, the Winnebago County circuit court granted the State's motion to dismiss 17 counts and proceed only on amended count VIII. After a June 2022 bench trial, the court found defendant guilty of first degree murder as either the perpetrator or under an accountability theory. Defendant filed a motion for a new trial and

directed finding. In March 2023, the court denied defendant's posttrial motion. After a May 2023 hearing, the court sentenced him to 35 years' imprisonment. Defendant filed a motion to reconsider his sentence, which the court denied in July 2023.

¶ 3　　　Defendant appeals, contending the State's evidence was insufficient to prove he shared the criminal intent of or had a common design with Lawson to beat up or sodomize Steven. We affirm.

¶ 4　　　　　　　　　　　　I. BACKGROUND

¶ 5　　　The State's amended count VIII asserted defendant and Lawson committed the offense of first degree murder in that defendant and Lawson, or one for whose conduct he is legally responsible, without lawful justification, battered Steven about the head, abdomen, and pelvis, knowing such acts created a strong probability of death or great bodily harm to Steven, thereby causing Steven's death, and the death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty. See 720 ILCS 5/9-l(a)(2) (West 2020).

¶ 6　　　On June 22, 2022, the trial court commenced a three day bench trial on the amended count VIII. The State presented the testimony of the following witnesses: (1) Debra DeLorme, Steven's ex-wife; (2) Frederick Kaehler, an eyewitness to Steven being left at a store; (3) Kevin Clouston, a Rockford police officer; (4) James Graham, a retired Rockford firefighter; (5) Janice Dotson, an eyewitness whose home was adjacent to the apartment where the incident occurred; (6) Richard Beaufils, a Rockford police officer; (7) Nicholas Weber, a Rockford police officer; (8) Stathis Poulakidas, a physician who treated Steven; (9) Adam Cox, a Rockford police officer; (10) Jenna Angileri, Lawson's daughter and defendant's girlfriend at the time of the incident; (11) Darien Sturtevant, defendant's sister; (12) DaCoda VanVleet, a Rockford police officer; (13) Brian Froehlich, the deputy coroner of Winnebago County; (14) Mark Peters, the

forensic pathologist who performed Steven's autopsy; (15) Dan Stewart, a Rockford police officer; (16) Oskaras Stundzia, a Rockford police sergeant; (17) Cartese Smith, Angileri's friend; and (18) Jeanelle Rill, Lawson's girlfriend. The State also presented numerous photographs, recordings, and other exhibits. Defendant testified on his own behalf and also presented multiple exhibits. The evidence relevant to the issue on appeal follows.

¶ 7        In March 2020, Lawson and Rill were dating and lived in apartment one at 524 South Third Street in Rockford, Illinois. Angileri, Lawson's daughter, was living with the pair. At that time, Angileri was dating defendant, who occasionally spent the night at the apartment. Dotson lived at 532 South Third Street, which was a home adjacent to the apartment building. Dotson testified the buildings were so close, she could see into Rill's apartment from her kitchen and living room windows.

¶ 8        On March 24, 2020, Lawson and Rill went to Steven's apartment, which he shared with Marcus Dodge. According to Rill, Lawson had worked for Steven "years ago." Angileri testified Lawson "used to hang out" with Steven and Dodge. Harry, Rill, and Steven drank, talked, and had a good time. Rill invited Steven to the barbeque she was having the next day at her apartment.

¶ 9        In the afternoon of March 25, 2020, Smith, who was a friend of Angileri, picked Steven up in a minivan and drove him to the barbeque at the apartment. Lawson, defendant, and Angileri went with Smith to pick up Steven. Smith did not stay at the barbeque because he had to work. Rill, Lawson, Angileri, defendant, and Steven were the only people to attend the barbeque, and they were all drinking alcohol, except for Angileri. Defendant and Angileri were the ones grilling the food that day. In the evening, Steven grabbed Angileri's purse and walked into the bathroom. Defendant pushed through the bathroom door and began fighting with

Steven. Angileri went into the bedroom and told Lawson about the fight and Steven's attempt to steal her purse. Steven, defendant, and Lawson then went to the living room. Angileri testified she remained in the bedroom. After the fight ended, Angileri called Smith to give Steven a ride home.

¶ 10    Eventually, Smith got off of work and went to the apartment. Angileri estimated it was about an hour from when she saw Steven after the fight until Smith arrived. Smith, with the help of defendant and possibly Harry, got Steven into the minivan. Defendant went with Smith in the minivan to drive Steven home. However, they feared Steven's roommate and dumped Steven at a closed pallet business. After leaving Steven, Smith and defendant returned to the apartment.

¶ 11    On a video surveillance system, Kaehler observed a van pull into the pallet store's parking lot and saw two people exit the van. When he went outside, Kaehler saw the people getting back into the van and was able to see the license plate number as the van drove away. He then observed a body lying on the ground and called 9-1-1. Graham, who at the time was a firefighter, arrived at the pallet store. When Graham first arrived, Steven was lying face down and not wearing a shirt, and his pants were pulled down to his knees. Moreover, Graham testified Steven was semiconscious, meaning he was responding to questions incoherently. Officer Clouston, who arrived after Graham, testified Steven had a "blood-soiled shirt." Steven was taken to a hospital. Officer Clouston testified Steven was unconscious at the hospital and he was unable to speak with him.

¶ 12    From speaking with Steven's roommate, officers learned Steven was friends with Lawson. Officer Froehlich went to 524 South Third Street, observed a minivan matching Kaehler's description, and called for more officers. When additional officers arrived, they

approached the residence and Officer Froehlich could smell a strong odor of cleaning products. He eventually interviewed Lawson at the police station. Sergeant Stundzia interviewed defendant. Rill, Smith, and Angileri were also interviewed on the evening of March 26, 2020.

¶ 13       Officer VanVleet testified she transported defendant to the Winnebago County jail on March 27, 2020. Defendant was complaining of a wrist injury. He stated, "he punched the mother f*** a couple of times." Defendant was taken to the hospital to get his wrist evaluated and was later released from the hospital.

¶ 14       Steven was taken to the hospital where he was treated by Dr. Poulakidas. Dr. Poulakidas testified, when Steven arrived at the hospital, he was unconscious and in shock. Dr. Poulakidas operated on Steven's abdomen. Steven had two perforations in his colon, his spleen was torn off its blood vessels, and his pancreas was transected in half. He also had a concomitant head injury. Dr. Poulakidas referred to Steven's head injury and the abdominal injuries as "two separate injuries." Given the nature of the injuries and Steven's later comments to medical professionals, Dr. Poulakidas opined Steven's abdominal injuries were the result of "[s]ome force trauma related to a penetrating trauma" consistent with "the story of being sodomized with a broomstick." Steven's head injury improved. He eventually regained consciousness and was transferred to a rehabilitation center. He was only there a few days before he was readmitted to the hospital for abdominal bleeding. Steven died on June 4, 2020. Dr. Poulakidas opined Steven's death was a result of the attack on March 25, 2020. When asked on cross-examination if he agreed the head injury was not the cause of death, Dr. Poulakidas answered, "Probably that would be a consistent statement, but—." Defense counsel interrupted and stated, "I mean, if it was improving; correct?" Dr. Poulakidas responded, "Correct."

¶ 15       On June 5, 2020, Dr. Peters, who was a forensic pathologist, conducted Steven's

autopsy. In doing so, Dr. Peters reviewed Steven's medical records. The records noted, when he first arrived at the hospital, Steven had a left-sided subdural hemorrhage and a diffuse axonal injury to his brain. Diffuse axonal brain injuries can result from severe beatings. He later developed a right-sided subdural hemorrhage. At the time of the autopsy, the subdural hemorrhages were healing. Dr. Peters also described defendant's numerous abdominal injuries. He opined Steven died of multiple medical conditions caused by blunt trauma to the head, abdomen, and pelvis.

¶ 16        The eyewitnesses testimony varied as to what occurred on March 25, 2020. Angileri testified, based on her observations, she believed Steven was drunk before he arrived at the apartment, and he continued to drink alcohol at the barbeque. When she and defendant came into the apartment after grilling, Steven told defendant he did not know how to cook and called him a "pussy." She also testified Steven had been flirting with her at the barbeque that day. She and defendant were avoiding Lawson, Rill, and Steven because those three had gotten into a dispute and Angileri preferred not to be around drunk people.

¶ 17        Moreover, Angileri testified defendant and Steven were still in the bathroom when Lawson came out of the bedroom. When she was in the bedroom, she heard lots of yelling and what sounded like fighting. Specifically, she heard Lawson yell, " 'You're my best friend. How could you do this? I should knock your brains out.' " After about 15 minutes, defendant and Lawson returned to the bedroom. When she left the bedroom, Angileri observed Steven sitting up on the living room floor and had a lot of blood on his face. It was coming out of his ear, mouth, and nose. Steven apologized to Angileri and asked for a ride home. Angileri testified she called Smith a little after 8 p.m. She later testified Steven was sitting on a chair in the dining room area when she first saw him after the fight. When Smith arrived, Steven could

stand but started to fall back down. Defendant, Lawson, and Smith helped get Steven into Smith's van. Lawson did not go with them to drop Steven off because he was extremely drunk. Angileri estimated it was about an hour between the time she saw Steven sitting in the living room and when he was carried out to the van. No one rendered first aid to Steven while he sat there.

¶ 18　　　　Angileri estimated Smith and defendant were gone 10 minutes in dropping Steven off. According to Angileri, the apartment "smelled terrible" and was a mess. Near where Steven had been sitting was a pool of blood, which Angileri described as the biggest pool of blood she had ever seen. Given the state of the apartment, she, defendant, and Smith spent the night at Smith's residence. At Smith's residence, defendant apologized to Angileri by saying he was " 'sorry [she] had to see that.' " Defendant was also very upset and thought he was going to jail. The next morning, Angileri, defendant, and Smith returned to the apartment, and Lawson offered to pay for cleaning supplies if the trio would go get them. Angileri, defendant, and Smith did so and returned to the apartment with the supplies. Lawson and Smith cleaned the blood that was in the apartment. Angileri could not recall if defendant also cleaned up the apartment.

¶ 19　　　　Angileri admitted she initially lied to police during her March 26, 2020, interview by telling them she slept through the whole incident. Angileri did not recall saying she was " 'pretty sure' " (1) Lawson hit Steven more than once and (2) " 'he kicked him at least.' " Angileri did recall, when Lawson struck Steven, he yelled, " 'I'll stomp your brains out.' " Angileri later admitted she said during the interview Lawson stated he had punched Steven, but she did not think Lawson actually said that. She further acknowledged telling the police Rill would occasionally run out of the bedroom, try to pull Lawson off Steven, and try to get Lawson into the room to calm down. At the end of the interview, Angileri remarked, " 'It was way out of

hand.' " Angileri testified her aforementioned comment meant defendant took it too far by beating Steven to the extent he did.

¶ 20 Angileri further testified she only saw defendant hitting Steven with his hands. Angileri did not recall Lawson "severely going after Steve[n]." She remarked Lawson and defendant had been friends for a very long time and noted Lawson "just talks a lot and acts like he's going to do things when he's drunk." She assumed defendant inflicted most of the injuries on Steven and not Lawson. Angileri admitting calling the police on Lawson in 2017 for a violent act, and he was arrested. According to Angileri, Lawson "drank a lot every day." For her actions in the incident, the State charged Angileri with obstructing justice, but she pleaded guilty to a lesser charge of attempt (obstructing justice) in exchange for her truthful testimony. Angileri also agreed to having no contact with defendant. However, she was allowed to have contact with Lawson.

¶ 21 Rill testified the individuals at the barbeque were drinking heavily. At some point during the barbeque, she had an argument with Lawson because he put Steven in her bedroom and wanted her to do something sexual with Steven. Rill removed Steven from her bedroom and began drinking heavily alone in the bedroom. Lawson eventually came into the bedroom, and they began having sex. Angileri "busted into the room" and announced defendant was beating on Steven. She and Lawson got dressed, and she was the first one out of the bedroom. Rill observed Steven lying on the floor between the living room and dining room. According to Rill, the beating was over when she and Lawson exited the bedroom. Rill denied trying to pull Lawson off of Steven and hearing Lawson say he was " 'going to stomp Steve[n]'s brains out.' " She also saw defendant with a broom in his hand. Defendant walked past her and went out the back door with the broom. According to Rill, defendant stated, " 'Who got butt-f*** now?' "

Rill observed Steven's face was "really tore up." She further testified Steven was mumbling but not talking. After a while, defendant and Smith helped carry Steven out of the apartment. According to Rill, Lawson went to help but was too drunk to help them with Steven.

¶ 22　　　　Rill further testified she was "really hungover bad" during the March 26, 2020, police interview. She met again with the police on June 22, 2021, and provided them additional information. Hearing Angileri's version of the incident the day after the interview sparked Rill's memory. Rill then recalled defendant walking away with a broom. She also told the police a broom may have been in the yard next to her apartment. (The police did locate a broom.) Rill admitted at the time of the beating she was drinking a "15-pack a day."

¶ 23　　　　Dotson, Rill's neighbor, testified she saw Rill in her kitchen get "all up on" Steven. She explained Rill was seducing Steven with a lap dance. Dotson could observe Lawson was upset with Rill. Rill appeared to comfort Lawson, and Lawson appeared to say something to Steven. Steven appeared to deny doing anything inappropriate. Defendant then approached and got "all up in" Steven's face. Dotson then observed an argument between Lawson, Rill, and defendant. She heard Lawson tell Rill, " 'Get your F'ing face out of here' " and then say to Steven, " 'I don't F around.' " According to Dotson, Lawson and defendant continued to argue in the kitchen, and defendant told Lawson, " 'I'll F him up. I'll F him up.' "

¶ 24　　　　Lawson and defendant then went to the living room. Dotson observed some "quick movement," which she explained was "[l]ike a fight" in the living room. According to Dotson, everybody was moving. Lawson and defendant then came outside, and defendant was not wearing a shirt. Rill remained inside, and the windows were closed. She heard Lawson tell defendant, he would " 'handle it' " and encouraged defendant to go to the store. Defendant appeared agitated and changed his shirt. Dotson heard defendant say, " 'I kill the MF.' " Both

- 9 -

the prosecutor and defense counsel agreed the "kill" statement had not previously been disclosed. She then saw defendant, Angileri, and Smith leave and come back with alcohol. After a while, she observed two people, whom she believed to be defendant and Lawson due to a difference in height, dragging Steven into the van. According to Dotson, defendant, Smith, and Angileri got into the van with Steven. Smith was driving. The van was gone about 20 to 35 minutes, and when it returned, Steven was not with them. Dotson had met Rill, Lawson, Angileri, and defendant prior to the events on March 25, 2020. Dotson did not know Smith, whom she referred to as the young African American, and Steven, whom she referred to as the Hispanic guy.

¶ 25          Smith testified on March 25, 2020, at a little after 8 p.m., he received a phone call from Angileri, who was scared and freaking out. She asked Smith to come to her apartment because she needed help. Smith assumed a drunk fight had occurred between defendant and Steven and he would need to take Steven home. When he entered the apartment, he observed Steven sitting in a chair, the place in a little bit of disarray, and blood on the floor from the door to the chair. Smith later testified Steven was lying on the floor with his pants down and he and defendant sat Steven on the chair. Smith described Steven as "half conscious and able to partially understand what was going on around him." Smith described Steven's face as "contorted" and swollen with blood pouring out of his mouth. Smith also noted Steven was wearing a shirt and pants.

¶ 26          Defendant and Angileri explained to Smith what happened. According to Smith, defendant indicated "he didn't mean to, in a sense, get him to that point but that the man was still talking—Steve[n] was still making comments about what had happened or what he would do to [Angileri] and stuff and egging on [defendant]." According to Smith, defendant admitted, "[j]ust

a little bit," he went too far. Defendant also told Smith, when he was beating up Steven, Lawson, Rill, and Angileri were all trying to pull him off of Steven. Defendant also mentioned Lawson had twice stomped on Steven. Moreover, after defendant had stopped striking Steven, Rill tried to pull Lawson off of Steven. Smith and defendant put peroxide on Steven's injuries and tried to get him to stop bleeding.

¶ 27 Smith further testified Steven was unable to walk and it took him, Lawson, and defendant to get Steven into the van. Smith admitted they dropped Steven while carrying him and Steven hit his head on the wooden steps. He and defendant were the only two in the van with Steven. Smith noted his vehicle smelled like blood and feces. He also testified defendant struck Steven twice while they were in the vehicle because defendant was offended by what Steven was saying. Steven was telling them to stop and not to take him anywhere. They were scared, if they took Steven home, his roommate would start shooting at them. Defendant decided they should leave Steven some place where someone would find him. Smith chose a location around the corner from Steven's home. As they were removing defendant from the vehicle, someone came out of the business. He and defendant got back in the van as fast as they could, and Smith drove off.

¶ 28 Smith drove back to Angileri's apartment and then left. According to Smith, defendant and Angileri did not spend the night at his residence. Smith then returned to the apartment the next day. He then drove defendant, Angileri, and Lawson to the Dollar General store to get cleaning supplies. After watching a surveillance video, he testified Lawson did not go with him to the Dollar General. It was just defendant and Angileri. When they returned to the apartment, Smith helped clean the floor and walls. He noted there was a lot of blood. Smith acknowledged he was charged with a felony for the incident. In exchange for his truthful

testimony, his charge was reduced to a misdemeanor and the petition to revoke his probation was withdrawn. Additionally, Smith testified, when he was driving Steven to the barbeque on March 25, Steven said something regarding Angileri that offended defendant and defendant told Steven to stop. Steven also told defendant, "he'd f*** him in the a***."

¶ 29 Sturtevant testified she was defendant's half-sister and received messages through Facebook Messenger from him on March 26, 2020. The messages began around 1 p.m. The trial court admitted photographs of the messages, in which defendant admitted he "f***d up" and was scared. When Sturtevant asked what defendant did, he typed the following: "Beat tf outta someone last night nd they in the hospital with life threating injuries i dropped him of on the road by 20th nd left him it was on the news nd shit." He further typed, "Idk wtf to do." Sturdevant asked who it was and he replied as follows: "Jenna dad friend he tried to steal jenna money and i bugged tf up nd blacked out." He also sent Sturdevant the screenshot Terrell (last name unknown) took of Steven when defendant was talking to Terrell the night before. Defendant noted he had called Terrell to help get Steven out of the house. Defendant stated he was scared because there was so much blood everywhere and noted they were still cleaning up.

¶ 30 On March 28, 2020, defendant called Sturtevant from jail. He began by admitting he "f***ed up." When Sturtevant questioned whether the incident was over money, defendant noted he thought the man was trying to sexually harass Angileri but "bugged the f*** up" because the man was trying to steal her money. Defendant stated he "tweaked." Sturtevant next asked about "her dad," and defendant explained Lawson did so after him and "started to stomp and s***." Defendant indicated he believed the kicking put the man in critical condition because his "hand ain't that big." Defendant again told Sturtevant he was scared and he was in "some serious s***."

- 12 -

¶ 31        Defendant testified he was 27 years old in March 2020.  He has aortic stenosis, which prevented him from playing as a child and causes him to get fatigued easily.

¶ 32        Defendant had seen Steven once before the day of the barbeque, and Steven had consumed alcohol on that occasion.  When they picked Steven up for the barbeque, defendant observed Steven was drunk because he was stuttering, not walking straight, and had a strong odor of beer on him.  On the ride back to the apartment on Third Street, Steven was being "extremely disrespectful" to Angileri.  He was making comments about how sexy she was. When defendant told him to stop, Steven threatened to kick his "a***."  Defendant admitted Steven was also being disrespectful to him as well.  At the apartment, defendant cooked the meal for everyone.  Steven told defendant his "food sucked."  As Angileri ate her hamburger, Steven made a comment about how her mouth looked really sexy while she was eating.  When defendant put the dog away in its cage, Steven made a comment about "f***ing [him] in the a***."  Defendant took it as disrespectful and told Steven he did not like the comment, as it was disrespectful to him.  Defendant testified it was common for Steven and Lawson to "play around with each other" by accusing each other of being homosexual.  Steven, Lawson, and Rill were all drunk and arguing with each other.  They tried to bring defendant and Angileri into their arguments, so defendant and Angileri went outside to avoid them.

¶ 33        At some point, defendant and Angileri went back inside so defendant could grab his marijuana.  Defendant admitted he was intoxicated from drinking a pint of Hennessy. Defendant saw Steven grab Angileri's arm and thought he was trying to sexually harass her. Defendant started walking towards Steven, and Steven went into the bathroom.  When defendant questioned what was going on, Angileri indicated Steven had taken her purse.  Defendant then went into the bathroom and saw Steven drop something next to the toilet as he was sitting down.

Defendant saw money on the floor and hit Steven in the face. Defendant testified Steven made a "gesture like maybe he was going to grab me." Steven attempted to get up, and defendant hit him a couple more times. Defendant then told Steven to get up and get out of the house. Defendant pushed Steven towards the front door. Steven was being argumentative and saying he was not going to leave. Defendant admitted punching Steven five times.

¶ 34 According to defendant, Lawson came out of the bedroom and questioned what was going on. Angileri said what happened, and Lawson, "just lost it." Lawson hit Steven, who fell to the ground. Lawson then started kicking Steven. When Lawson stomped on Steven, defendant grabbed Lawson and told him he could not stomp on Steven. Defendant let Lawson go, and he again stomped on Steven. While Lawson was attacking Steven, he was screaming, and defendant believed Lawson made a comment about stomping Steven's brains out. Rill appeared and tried to get Lawson to return to the bedroom. Lawson did not want to go, and defendant told him to " '[g]et the f*** back in the bedroom.' " He further told Lawson he was trying to handle the situation and Lawson did not want to kill Steven. Defendant believed Angileri was standing right there. Lawson started walking back to the bedroom, and defendant panicked because he did not have his cell phone. He looked in the living room, bathroom, and then outside. Defendant believed he spent 10 to 15 minutes looking for his cell phone but did not find it.

¶ 35 Defendant went back inside the apartment, and Steven was sitting up. Defendant learned Angileri had called Smith to get Steven a ride home. Defendant used Angileri's cell phone to contact his friend Terrell via Facebook chat. Defendant first testified he contacted Terrell because he could not find his cell phone and wanted to know if he left it in Terrell's car. He later testified he was trying to see if Terrell could give Steven a ride home. Defendant was

unaware Terrell had taken a screenshot showing Steven during their Facebook video chat. Defendant found his cell phone the next day in the backyard. When he learned of the screenshot, he told Terrell to take down his Facebook post of the screenshot.

¶ 36 When Smith arrived, defendant and Smith sat Steven in a chair. Steven was saying something, but defendant could not understand him. Defendant helped Smith clean Steven up and gave him water. Defendant denied knowing Steven was severely injured. He thought he was just drunk and beat up. Defendant acknowledged Steven could not stand on his own, and he, Lawson, and Smith carried Steven to the minivan. Defendant went with Smith to drop Steven off. According to defendant, it was Smith who did not want to go to Steven's house because of cameras. Defendant just went along with Smith's decision to drop Steven off near his house.

¶ 37 Defendant denied knowing what he did would likely kill Steven. He further testified he did not punch Steven in the van after the incident. Defendant also denied witnessing someone stick a broom in Steven's rectum.

¶ 38 During his police interview, defendant first told the officers he was not in Rockford the night before. Eventually, defendant admitted he was present at the apartment and "lost it" when he saw Angileri's purse and money on the floor. Defendant told police he punched Steven five times and smacked him a couple of times. He noted he was not the only one hitting Steven. Defendant told police he was not the one who used his feet and tried to stop the person who did. During the interview, defendant did admit he smacked Steven in the van after the incident because Steven was talking and trying to open the door.

¶ 39 At the conclusion of defendant's trial, the trial court announced its decision. The court explained it did not have to decide who inserted something into Steven's rectum. It found,

under all of the circumstances, the internal injuries were part of the same course of conduct as the head injuries. The court concluded by finding the following:

> "I find the [defendant], or one for whose acts he is legally responsible, performed the acts which caused the death of Steven Delorme; and that when [defendant], or one for whose acts he is legally responsible, knew that such acts created a strong probability of death or great bodily harm to Steven Delorme; and that [defendant] was not justified in using the force with which he used. I further find that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

¶ 40    Defendant filed a motion for a new trial and directed finding raising numerous contentions of error, including the State failed to prove him guilty beyond a reasonable doubt. In December 2022, defendant filed an amended posttrial motion. After a March 9, 2023, hearing, the trial court denied defendant's amended posttrial motion.

¶ 41    At a March 23, 2023, hearing, the parties presented the trial court with an agreement as to sentencing. Under the agreement, defendant would testify against Lawson, and his sentence would be capped at 35 years' imprisonment. The court accepted the parties' agreement. On May 19, 2023, the court held the sentencing hearing. After hearing the evidence and the parties' arguments, the court sentenced defendant to 35 years' imprisonment.

¶ 42    Defendant filed a timely motion to reconsider his sentence, which the trial court denied after a July 5, 2023, hearing. That same day, defendant filed a timely notice of appeal, which lacked attorney information but indicated defendant was appealing his first degree murder conviction. On July 24, 2023, defendant filed a timely amended notice of appeal that complied with Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021). See Ill. S. Ct. R. 606(d) (eff. Mar.

12, 2021); R. 303(b)(5) (July 1, 2017).  Accordingly, this court has jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 43                                        II. ANALYSIS

¶ 44         Defendant contends the State's evidence was insufficient to prove beyond a reasonable doubt he committed the offense of first degree murder.  Our supreme court has set forth the following standard of review for insufficiency of the evidence claims:

> "It is well settled that, when reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  (Emphasis omitted.)  [Citation.]  All reasonable inferences from the evidence must be drawn in favor of the prosecution.  [Citation.]  This court will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt. [Citation.]"  (Internal quotation marks omitted.)  *People v. Cline*, 2022 IL 126383, ¶ 25, 193 N.E.3d 1220.

¶ 45         Here, the State charged defendant both as the perpetrator and under a theory of accountability.  Under Illinois law, a person may be held legally accountable for the conduct of another when, "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."  720 ILCS 5/5-2(c) (West 2020). "[A]ccountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses."  *People v. Dennis*, 181 Ill.

2d 87, 105, 692 N.E.2d 325, 335 (1998).  Our supreme court has held, to prove "a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design."  *People v. Fernandez*, 2014 IL 115527, ¶ 13, 6 N.E.3d 145.  Under both theories of accountability pursued, the State must show the defendant had "the intent to promote or facilitate a crime."  (Internal quotation marks omitted.)  *People v. Baker*, 2022 IL App (4th) 210713, ¶ 42, 214 N.E.3d 196.  Defendant contends the State's evidence was insufficient to prove him guilty under both theories.

¶ 46                                    A. Shared Intent

¶ 47          Ordinarily, the State proves a defendant's mental state circumstantially by inferences reasonably drawn from the evidence.  *Baker*, 2022 IL App (4th) 210713, ¶ 50.  "Intent may be inferred from the character of defendant's acts as well as the circumstances surrounding the commission of the offense."  *Baker*, 2022 IL App (4th) 210713, ¶ 50 (quoting *People v. Perez*, 189 Ill. 2d 254, 266, 725 N.E.2d 1258, 1265 (2000)).

¶ 48          Defendant contends the State presented no reliable evidence he shared Lawson's intent to cause great bodily harm to Steven.  Defendant's assertion overlooks a multitude of circumstantial evidence showing his intent to do just that.  As soon as the group picked up Steven, who was Lawson's friend, defendant felt Steven's comments were disrespectful to his girlfriend, Angileri, and to himself.  The disrespectful comments from Steven to defendant continued at the barbeque, as Steven told defendant his "food sucked."  Steven also told defendant he would "f*** him in the a***," and defendant told Steven not to talk to him in that manner.  The trial court, as the trier of fact, was not required to believe defendant's self-serving testimony Steven's comments did not make him angry.  See *People v. Moreira*, 378 Ill. App. 3d

120, 130, 880 N.E.2d 263, 272 (2007). The fact defendant noted Steven's disrespect and comment about his a*** very early in explaining his version of the facts to the police also suggest the comments inflamed defendant. Moreover, when describing his reaction to Steven taking Angileri's money and how the attack on Steven followed, defendant used terms such as "bugged the f*** up," "blacked out," and "lost it." The aforementioned descriptions indicated the intensive reaction defendant had to Steven's actions. Defendant then admitted hitting Steven five times and smacking him as well. Defendant's hitting Steven resulted in defendant injuring his right hand and seeking medical treatment for the injury. As such, the evidence supports a finding defendant inflicted a severe beating on Steven.

¶ 49        While defendant testified he tried to stop Lawson from kicking Steven, defendant did not seek medical treatment for Steven. Instead, he spoke to his friend, Terrell, in a video chat in a manner that allowed Terrell to see a very bloody and shirtless Steven. More than an hour after the beating ended, defendant then helped carry Steven, who then could not stand on his own, had a swollen and contorted face, and was only half coherent, to the minivan. Defendant did not suggest Steven should be driven to the hospital but, at best, suggested he should be dropped off at his home. As Smith drove, defendant hit an already severely beaten Steven a couple of more times. He then assisted Smith with dumping Steven at a closed pallet store. After they left Steven, defendant again did not seek assistance for Steven. Such circumstantial evidence was sufficient for the trial court to find beyond a reasonable doubt defendant intended to cause great bodily harm to Steven.

¶ 50        In support of his argument, defendant relies on *People v. Taylor*, 186 Ill. 2d 439, 712 N.E.2d 326 (1999), which cites *Dennis*. In both *Dennis* and *Taylor*, the defendant was the driver of a car whose passenger, wholly unbeknownst to the defendant, intended to commit a

crime.  *Fernandez*, 2014 IL 115527, ¶ 20.  In both cases, the defendant was convicted of the passenger's crime on an accountability theory based principally on the fact the defendant drove the passenger away from the crime scene after its commission.  *Fernandez*, 2014 IL 115527, ¶ 20.  In reversing the defendant's conviction in *Dennis*, our supreme court explained the following:

> "Holding a defendant who neither intends to participate in the commission of an offense nor has knowledge that an offense has been committed accountable does not serve the [accountability] rule's deterrent effect.  Further, the attachment of liability in such situations contravenes general concepts of criminal culpability."
>
> *Dennis*, 181 Ill. 2d at 105, 692 N.E.2d at 335.

In reversing the defendant's conviction in *Taylor*, our supreme court invoked its holding in *Dennis* and further explained, "a person may not be held accountable for a crime merely for being present, even when that person knows that a crime is being committed" and "a person generally will not be deemed accountable for acquiescing to the criminal activities of another." *Taylor*, 186 Ill. 2d at 446, 712 N.E.2d at 329.

¶ 51        Unlike the defendants in *Dennis* and *Taylor*, defendant was the individual who began the battering of Steven, and the circumstantial facts indicate it was a severe beating. Within a short period of time, Lawson began kicking and stomping on Steven.  Defendant remained with Lawson, did not seek medical help for Steven, hit Steven some more, assisted in dumping Steven at a closed store, and helped buy cleaning supplies to clean up the crime scene. As such, we find the State's evidence was sufficient for the trial court to find beyond a reasonable doubt defendant shared the intent with Lawson of causing great bodily harm to Steven.

¶ 52                    B. Common Design

¶ 53        Give the evidence was sufficient to prove accountability based on shared intent, we do not address the common design theory.

¶ 54                    C. Principal

¶ 55        However, we do point out the evidence was sufficient for the trial court to find defendant guilty as the principal. It was defendant who had animosity with Steven before Steven grabbed Angileri's purse. On the other hand, Lawson was a longtime friend of Steven. Defendant admitted to initiating the beating of Steven, not obtaining medical care for him, hitting him again when he was already in a severe medical condition, dumping him at a closed pallet store, and helping with the purchase of cleaning supplies for the crime scene. Those facts, along with his call to Terrell and the texts to his sister, indicate he severely beat Steven with the knowledge such acts created a strong possibility of great bodily harm to Steven. It was not necessary for the State to prove beyond a reasonable doubt defendant sodomized Steven. Dr. Peters, the forensic pathologist who performed the autopsy on Steven, opined Steven "died of multiple medical conditions caused by blunt trauma of the head, abdomen, and pelvis." As such, the severe beating of Steven alone contributed to his death. Here, the evidence was sufficient to prove beyond a reasonable doubt defendant knew his acts created a strong probability of great bodily harm to Steven.

¶ 56                    III. CONCLUSION

¶ 57        For the reasons stated, we affirm the Winnebago County circuit court's judgment.

¶ 58        Affirmed.