2026 IL App (4th) 241165

NO. 4-24-1165

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 27, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| DMITRI G. ROGATCHEV, | ) | No. 19CF746 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Lannerd and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1        In June 2024, a jury found defendant, Dmitri G. Rogatchev, guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)). The trial court sentenced him to 60 years in prison. Defendant appeals, arguing that (1) the court erred in refusing to instruct the jury on the lesser-included offense of involuntary manslaughter, (2) the State failed to present sufficient evidence to prove him guilty beyond a reasonable doubt, (3) the court erred in denying his motion for substitution of judge for cause, and (4) the court erred in denying his request to represent himself. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        In December 2019, a grand jury returned an indictment alleging that defendant committed the offense of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) when he "struck

Sandra Jackson in the head *** knowing such act created a strong probability of death or great bodily harm to Sandra Jackson, a person 60 years of age or older thereby causing the death of Sandra Jackson." At his first court appearance, defendant requested an attorney. The court appointed Public Defender Nate Bach, and defendant entered a plea of not guilty.

¶ 4        Over the course of several hearings in January and February 2021, the trial court and defendant had multiple discussions about defendant's representation. In January 2021, defendant filed a handwritten motion, complaining that Bach was "ineffective and malicious in nature," requesting his removal and the appointment of a different attorney from the public defender's office. The court warned defendant that he "would be making a big mistake" if he removed his attorney, and the court ultimately denied the motion. A few weeks later, in February 2021, the court again discussed the issue with defendant. Though the court told defendant that it would be unwise to represent himself, defendant maintained that he would like to do so. The court ultimately allowed defendant to proceed *pro se*.

¶ 5        Defendant then requested a continuance to review the "voluminous" discovery. The trial court granted the continuance. Thereafter, the court agreed to appoint a different attorney from the public defender's office to represent defendant. When defendant asked whether he could "still reserve the right to represent [him]self later," the court informed him that he could, but he could not change his mind again during, for example, jury selection, which would cause a delay. The court appointed Assistant Public Defender Jennifer Patton.

¶ 6        At a scheduling conference in June 2021, defendant requested the removal of Patton as his attorney due to "conflict of interest and irreconcilable differences." At that point, the jury trial was set for July 2021. Defendant also made an "oral motion to recuse judge for cause," which "will be supported by a written [motion] with the affidavit, provided that the authorities at the jail

- 2 -

will affirmatively shoulder their responsibility and allow [him] to produce the affidavit to support the motion." The State expressed its belief that this motion was "another tactic of the defendant" to delay the trial, noting that such motion needed to set forth the grounds for substitution in writing. Patton indicated that she would not adopt that motion. Defendant then continually interrupted the trial court and was removed from the courtroom. After defendant was removed, the court discussed the matter with Patton and the State. The court expressed that it "would need a written motion" for substitution of judge." The court also noted, "I wonder how much of this is an attempt to delay," and stated,

> "I'm worried that this is going to be the way this goes down. He's going to represent himself. He's going to be so disruptive at his trial that I'm going to have to have him removed and we do his jury trial without him being here and without him having a lawyer."

Because the trial date was only 18 days away, the court and the parties agreed to continue the trial.

¶ 7 At a subsequent hearing in July 2021, defendant again expressed that he would like to represent himself. The trial court admonished defendant thoroughly about the consequences of representing himself and accepted defendant's waiver of counsel. The State then reminded the court of defendant's prior motion for substitution of judge and stated that it would "waive the right to have a written motion." Defendant explained that he was unable to file a written motion because he was "deprived of the access of the law library."

¶ 8 In August 2021, the matter had been set for a hearing on defendant's motion for substitution of judge before a different judge. That judge stated that defendant had not filed a written motion, and "unless that's done it will not be entertained," "and that's pursuant to statute." Defendant explained that he was unable to access the law library to prepare a written motion. On

August 19, 2021, back before the original trial judge, defendant stated that he wished to file a written motion for substitution of judge with an accompanying affidavit but claimed he was unable to prepare those documents because he was not given access to the law library at the county jail. The trial court allowed defendant another opportunity to file a written motion and set the matter for two weeks out. On September 2, 2021, defendant indicated he still did not have access to the law library. On September 13, 2021, defendant indicated he was able to access the law library twice since September 2, 2021, but maintained that he needed more time. The court instructed defendant to keep a log of when he is allowed access and scheduled the trial for February 14, 2022. Defendant did not raise the issue of substitution of judge for cause again or file a written motion at any time.

¶ 9          On February 10, 2022, defendant requested a continuance, which the trial court granted. The court set a new trial date for July 2022. In June 2022, defendant requested an evaluation of the "mental condition of the defendant at the time of the events." The court denied the request, as defendant had already been evaluated in 2020.

¶ 10          On June 27, 2022, the trial court asked defendant if he wished to continue representing himself. Defendant asked the court, "If defense moves to request public assistance, then that would mean another continuance, is that correct?" The court agreed. Defendant then requested to be reappointed counsel, and the court appointed Assistant Public Defender Rachelle Roth. The State asked the court to "make it very very clear to the defendant that this is not an on again/off again thing" and "to make it clear *** that now that he has selected a Public Defender he can't come in, you know, the next time we're ready for trial and go, oh, I decided I don't want a Public Defender." In October 2022, defendant appeared before the court with Assistant Public Defender Michael Doubet. The court granted his motion for a continuance.

¶ 11          In February 2023, Doubet filed a petition to appoint an expert to determine defendant's sanity at the time of the offense. The trial court granted the petition. In August 2023, Doubet informed the court that although the jury trial was scheduled for September 18, 2023, defendant once again wanted to go *pro se*. Defendant argued that Doubet had a conflict of interest because of a "wrongful conversion of material facts." Defendant explained,

> "Wrongful conversion itself is when an attempt is made with intent to assert domain over the rights of another or influence the rights of another in a way that is adverse to the party who is entitled to the possession of that property.
>
> I do believe that is legally sufficient, Your Honor."

The court found that this was an insufficient reason to remove counsel and defendant's "request to go *pro se* is for purpose of delay, and I'm denying that." Doubet moved for the appointment of a medical expert related to the cause of death. The court allowed it and continued the trial. The trial was eventually reset for March 25, 2024.

¶ 12          At a scheduling conference on March 14, 2024, when the trial court asked if the parties were ready for trial, Doubet indicated he was, but defendant interrupted to say he was not ready. Defendant explained he "did not have adequate time to consult with the person who poses as my attorney" and claimed he had a conflict of interest because his attorney was a "*[d]e facto*" "Special Assistant State's Attorney." Though defendant initially claimed not to have talked to his attorney since August, he admitted that he spoke to him two days prior. Doubet explained that every time he visited defendant to discuss the case, defendant "wants to go around and discuss everything but the trial." On the day of trial, the State requested a continuance, which the court granted. The court set the trial for June 3, 2024.

¶ 13          At the next scheduling conference on May 16, 2024, defendant emphasized that

Doubet was "not [his] attorney." When defendant continually interrupted the trial court, the court removed defendant from the courtroom. At a hearing on May 30, 2024, the court noted that it had received Doubet's motion to withdraw. Doubet indicated that he had difficulty communicating and working with defendant, who did not want him as his attorney. Doubet believed that defendant was not doing this to delay. The State argued that defendant's agenda was to "keep thwarting the process," as he had done "for four years." The court denied Doubet's motion to withdraw.

¶ 14 Trial began on June 3, 2024, and continued through June 5. The following evidence was presented.

¶ 15 Maverick Rasmussen, an officer with the Galesburg Police Department, testified that he was dispatched to defendant's address around 2:30 a.m. on December 3, 2019, for "a medical call about an unresponsive female." He observed a woman, Jackson, "sitting upright in a chair, unconscious." He also saw defendant in the apartment. Defendant told Rasmussen that Jackson "had a couple of glasses of wine that evening *** along with some listed medication that she had" and that "she woke up about 2 o'clock, advised she was in pain and then she collapsed." Rasmussen did not believe any criminal activity had occurred at that point. Three or four hours later, he was dispatched to OSF St. Francis Medical Center (OSF Hospital), where Jackson was being treated for possible elder abuse. After speaking with the treating physician, Dr. Benjamin Kemp, it became apparent that Jackson's condition was not consistent with defendant's prior description of the situation. When Rasmussen talked with defendant, defendant reiterated the same story as before. Rasmussen learned that defendant had been living with Jackson for two years and taking care of her for five years.

¶ 16 Dr. Kemp, an emergency physician at OSF Hospital, testified that he assessed and treated Jackson in the morning on December 3, 2019. She was unconscious when she arrived. A

CT scan of her head revealed "a very large subdural hematoma," which he explained was "blood between the skull and the brain" that is "generally, from some traumatic injury." He also observed signs of herniation, which occurs when "there is so much pressure on the brain that it pushes the brain stem down into the spinal column" and carried a "high likelihood of death." He also noted "a small hematoma on the back of her head," which was a bruise on her scalp.

¶ 17 Dr. Kemp testified that Jackson was taking blood-thinning medication, which can make an individual more susceptible to brain bleeds. He did not know what caused Jackson's bleed and acknowledged that it could have been caused by a fall. However, he stated that "a fall that was minor enough to go unnoted or unrecognized in the emergency—like reported by EMS or any bystanders would not be severe enough to cause that amount of bleeding." He testified that "with that severe of a head injury the likelihood that she would be able to get up on her own and get into a chair and not require help off of the floor or be found by EMS on the floor seems rather low." Even for someone taking blood thinners, it "still required a pretty significant injury to the head to cause this sort of bleeding." He explained that Jackson's head injury was consistent with "[a]ny blunt injury to the scalp." Tests did not detect the presence of alcohol in Jackson's blood.

¶ 18 Dr. Kemp testified that Jackson's condition was not consistent with "drinking alcohol and taking medication." When he reviewed her medical records, he found "some notes *** from January from the primary care physician about some concerns of abuse at home." At that point, Dr. Kemp contacted the Center for Prevention of Abuse and the police "based on the concerns that there were inconsistencies with the story of how an injury may have occurred." Jackson died at 2:40 p.m., approximately 12 hours after being admitted to the hospital.

¶ 19 Officers from the Peoria Police Department took photographs and videos of defendant's residence, which the trial court admitted without objection. The photos showed many

pill bottles and liquor bottles, including wine and vodka bottles. An officer testified that he found more than 60 pill bottles, all prescribed to Jackson, in the home. Another officer testified that she took photos of more than 20 alcohol bottles in the home.

¶ 20 Clinton Rezac, an officer with the Peoria Police Department, testified that he became involved in an investigation regarding Jackson's hospitalization on December 3, 2019. He went to the hospital to see Jackson, but she was intubated and could not speak. He saw a bruise on her right leg. While he was in the hospital room, defendant arrived. Rezac had "a very lengthy conversation" with defendant; defendant consented to being recorded with Rezac's body-worn camera. Defendant described himself as Jackson's caretaker for approximately six years. He said Jackson did not fall. Defendant told him that "at approximately 2:00 to 2:30 a.m. that same day he had been woken to her screaming, yelling, being in pain," then he went to the living room and found that "[s]he was wanting medication," and he called 911. Defendant indicated that while he was on the phone, Jackson fainted. He picked her back up and sat her down in the chair. She began to faint again, but he was able to catch her.

¶ 21 Rezac testified that defendant said that he had slept "about two hours in the last three days" because "Jackson constantly has the [television] on inside the apartment at a very loud volume." Defendant described this as "driving him to the brink of insanity." On the afternoon of December 2, 2019, defendant took Jackson to a doctor's appointment, then went to the pharmacy and liquor store to "get wine for Ms. Jackson and beer for himself." He was gone for about an hour. When he returned home, he gave Jackson food and wine at her request. He then went to bed but later went back out to tell Jackson to turn down the television. Around 10:30 p.m., Jackson came to his bedroom and "was demanding that he give her the medications," but defendant refused, as he intended to give them to her at midnight. She returned "to the bedroom on more than one

- 8 -

occasion wanting medication." He said that she "was raising her voice, just being kind of disrespectful towards him and that he did not like that." She requested another glass of wine, which he gave her.

¶ 22 When Jackson reiterated her request for medication, defendant "lost his temper" and "kicked the leg of the chair," then "tried to kick the same leg of the chair again and kicked Ms. Jackson's leg." He said, "she screamed in pain" and "made a derogatory comment towards him." He immediately apologized to her for kicking her by accident. However, he then "slapped her in the face with his left hand" on her right cheek. This occurred about two hours before he called 911. Defendant then went back to his bedroom and later came out "because he could hear her screaming in pain." She still wanted the medication, and then he called 911. Defendant said he struck her only once and did not strike her with an object. He told Rezac that he had drank four beers and a glass of wine. Defendant "didn't think that he would have caused [the brain bleed]" but said "if he did, then let it be God's will, or something to that nature." Defendant never stated that anyone else was present in the apartment with him and Jackson at any time. Defendant admitted to Rezac that he had hit Jackson on two previous occasions. On one occasion in July 2019, Jackson was "disrespectful towards him," and he struck her in the face. After the interview, Rezac arrested defendant for domestic battery.

¶ 23 Rezac attended Jackson's autopsy on December 4, 2019, and after discussing the findings with the doctor who performed the autopsy, Dr. Amanda Youmans, Rezac interviewed defendant again. Defendant maintained that "he still only could remember hitting her once," but Rezac testified that "[defendant] didn't quite deny not [*sic*] hitting her more than that." After Rezac informed defendant that Jackson had died, defendant was distraught and "said twice that he killed her." Defendant said bruising on Jackson's upper arms "was caused by him putting his hands on

her shoulders and sitting her down into the chair." Defendant "was taking responsibility for causing her injury and he just could not recall exactly what he did to her."

¶ 24　　　　Additionally, in a clip of the video of Rezac's second interview of defendant, which was played at trial, when Rezac was explaining the findings of the autopsy, defendant reiterated that he did not remember what he did but stated, "[I]f I hit her repeatedly, then I hit her repeatedly. If this is what facts show, then that's what I did," and he questioned, "[W]hat could I possibly hit her with?" He later stated, "Clint, I'm guilty. I'm guilty. I understand that."

¶ 25　　　　Dr. James Barnett testified that he was a family physician and had treated Jackson for nine years. Jackson was 75 years old and had a number of medical conditions, including osteoarthritis (degenerative changes in the bone) in her knees, shoulders, and neck, emphysema (also known as chronic obstructive pulmonary disease, which causes issues with exchanging oxygen in the lungs), generalized anxiety disorder, depression, alcohol use disorder, hypertension (high blood pressure), atrial fibrillation (issues with the heart beating), and congestive heart failure. She was on blood-thinning medication because the atrial fibrillation caused a higher risk of stroke. She additionally had breast cancer, which had been in remission for 10 years, and "a variety of other illnesses," such as chronic kidney disease. She was overweight and used a walker or a cane to walk.

¶ 26　　　　Dr. Barnett testified that Jackson visited him on January 18, 2019, and expressed concerns about her anxiety. She reported that "her roommate and helper had a bad temper," "he had been yelling and screaming at her," "he was psychotic at times," and "in the past he had hit her once." She returned to Dr. Barnett in February 2019 and reported "that things were better at home with the roommate" because "she had set strict boundaries with him." Dr. Barnett stated that he met Jackson again on October 16, 2019, where she "presented as very anxious," "discussed her

roommate Dmitri," and "was very concerned with how he had been speaking to her that day and was emotionally upset." Though defendant had previously been given access to her medical records, Jackson withdrew his access that day. Dr. Barnett noted in her medical record that she "[t]hinks she is safe." She expressed her intent to "end that relationship with him."

¶ 27        Dr. Youmans, a physician specializing in forensic pathology, was tendered by the State and accepted as an expert in the field of forensic pathology. She testified that she conducted an autopsy on Jackson on December 4, 2019. She described Jackson as five feet, seven inches tall and weighing 219 pounds. Dr. Youmans noted multiple injuries and bruises on Jackson's body, including bruises on the right side of her scalp, right cheek, arms, chest, abdomen, right leg, and left hand, and scratches on her left hand and right foot. Some bruises were more recent than others. The bruise on her right shin, right cheek, right arm, left hand, and one of the bruises on her abdomen were recent, while the second bruise on her abdomen and chest were older. None of the bruises below her head were life-threatening.

¶ 28        Upon conducting an internal examination, Dr. Youmans found a bruise under Jackson's skull on the left side and noted that the other bruise on the right side of her skull "extended all the way through the muscle to the skull bone." Further examination revealed that Jackson had a subdural hematoma, "a collection of blood that was on the right side of her brain," which "was approximately one inch thick and it caused compression of her brain." That compression in turn caused pressure on the brain stem, which would cause brain cell death and cardiorespiratory arrest. She also noted there was further bruising on the right side of her brain, meaning "that the brain suffered trauma in which the brain itself struck the inside of the skull[,] causing a bruise." Biopsies of the right-side bruising and left-side hematoma showed the injuries were acute and had occurred within 24 hours of her death. Dr. Youmans confirmed that Jackson

had no alcohol in her blood.

¶ 29       Dr. Youmans concluded that Jackson's cause of death was "intracranial hemorrhage due to blunt force head trauma." Dr. Youmans explained that the bilateral brain injuries showed "she suffered two blows to her head, one to the right side and one to the left side." She testified that this would not be consistent with a person striking her head on the floor or a single slap to the right cheek. She explained that "[w]hen people fall, they usually hit the front of the head, the forehead or the back of their head," but "they don't hit different planes of the body." She acknowledged that one of the injuries could be from a fall, but Jackson had "no injuries to her shoulders or her neck that would indicate she had a fall." She also stated that a single slap to the cheek would not be sufficient to cause the degree of bleeding in Jackson's skull; rather, it could only have been caused by a blow to the head, not the face. She agreed that this type of blunt force trauma would be consistent with a blow from a liquor bottle.

¶ 30       The State rested its case, and defense counsel moved for a directed verdict. The trial court denied the motion. Defendant did not testify or present any evidence.

¶ 31       The trial court and the parties then discussed jury instructions. Defense counsel offered Illinois Pattern Jury Instructions, Criminal, No. 7.07 (approved Jan. 30, 2015), which stated, "A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual *** by acts which are performed recklessly and are likely to cause death or great bodily harm to another." Defense counsel argued that there was "no evidence that there was blunt force" other than a slap and that the jury could imply that defendant "recklessly hit her and that slap is what killed her." The State objected to the instruction, arguing that there was no evidence to support giving it. The State argued that the coroner testified that "she didn't die from the slap," so defendant's "argument that the slap caused the death, the evidence shows that didn't

- 12 -

happen."

¶ 32    The trial court agreed with the State and denied the instruction, explaining, "I don't see where there's any evidence," defendant's argument was "contrary to the testimony," and it "sounds to me like that goes towards a not guilty verdict, not towards a lesser instruction." The court stated that when someone slaps someone else, "I don't know how it's anything but intentional." Defense counsel pointed out that "[i]t doesn't say it can't be an intentional act," as the mental state applies to the consequences of the act, not the act itself, and thus an intentional action can still be reckless where "[y]ou don't have the mental state to believe that that slap is going to lead to death or great bodily harm." The court noted, "I'm talking about the act performed. You're talking about the person performing the act, diagnosing the consequences of it. That's where you and I are differing and maybe you're right. I don't think so. But I think a punch, a slap, I don't see where those things are reckless."

¶ 33    The jury found defendant guilty of first degree murder.

¶ 34    The trial court held a sentencing hearing on July 15, 2024. Defense counsel noted that he filed a posttrial motion for judgment notwithstanding the verdict or for a new trial. In addition to several evidentiary issues, defendant argued that he was not proven guilty beyond a reasonable doubt, the court erred in denying his motion to represent himself, and the court erred in denying his request for a jury instruction of the lesser-included offense of involuntary manslaughter. The court denied the motion and proceeded to sentencing. The court sentenced defendant to 60 years in prison. Defendant filed a motion to reconsider sentence in August 2024, which the court denied.

¶ 35    This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37         On appeal, defendant argues that (1) the trial court erred in refusing to instruct the jury on the lesser-included offense of involuntary manslaughter, (2) the State failed to present sufficient evidence to prove defendant guilty beyond a reasonable doubt, (3) the court erred in denying defendant's motion for substitution of judge for cause, and (4) the court erred in denying defendant's request to represent himself.

¶ 38                              A. Jury Instructions

¶ 39         Defendant's first argument on appeal is that the trial court erred by refusing to instruct the jury as to involuntary manslaughter. Specifically, he argues that "[w]hile there was evidence that would support an inference that [defendant] struck Jackson, the jury could arguably have concluded that [defendant] was merely reckless to the possibility of death, and the jury should have been instructed accordingly."

¶ 40         The Illinois Supreme Court has established that

              "the appropriate standard for determining whether a defendant is entitled to a jury

              instruction on a lesser-included offense is whether there is *some evidence* in the

              record that, if believed by the jury, will reduce the crime charged to a lesser offense,

              not whether there is *some credible* evidence." (Emphases in original.) *People v.*

              *McDonald*, 2016 IL 118882, ¶ 25.

Importantly, "[i]t is not the province of the trial court to weigh the evidence when deciding whether a jury instruction is justified," as it is the jury's function to determine credibility. *McDonald*, 2016 IL 118882, ¶ 25. This is especially true for "the task of inferring the defendant's mental state from the surrounding circumstances," which the supreme court has noted "is 'particularly suited to the jury.' " *People v. Eubanks*, 2019 IL 123525, ¶ 80 (quoting *People v. DiVincenzo*, 183 Ill. 2d 239,

252 (1998), *abrogated on other grounds by McDonald*, 2016 IL 118882). "[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *McDonald*, 2016 IL 118882, ¶ 42. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *McDonald*, 2016 IL 118882, ¶ 32.

¶ 41       "[I]nvoluntary manslaughter is a lesser included offense of first degree murder." *Eubanks*, 2019 IL 123525, ¶ 73. As defendant points out, "[t]he difference between first degree murder and involuntary manslaughter lies in the defendant's mental state." *McDonald*, 2016 IL 118882, ¶ 51. Specifically, " '[i]nvoluntary manslaughter requires a less culpable mental state than first degree murder.' " *Eubanks*, 2019 IL 123525, ¶ 74 (quoting *DiVincenzo*, 183 Ill. 2d at 249-50). Relevant to this case, a defendant commits first degree murder when he "kills an individual without lawful justification" and "knows that [the acts which cause the death] create a strong probability of death or great bodily harm to that individual." 720 ILCS 5/9-1(a)(2) (West 2018). " 'Knowledge' is a conscious awareness that one's conduct is practically certain to cause a particular result." *McDonald*, 2016 IL 118882, ¶ 51 (citing 720 ILCS 5/4-5 (West 2014)).

¶ 42       In contrast, a person commits involuntary manslaughter when he "unintentionally kills an individual without lawful justification" and "his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2018). A person acts recklessly "when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes

a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

¶ 43        There is a distinction between the mental state involved in performing the act and the mental state regarding the consequences of that act; as a result, "a defendant may act recklessly where he commits deliberate acts but disregards the risks of his conduct." *DiVincenzo*, 183 Ill. 2d at 252. Thus, an act does not have to be unintentional or accidental to be reckless.

¶ 44        Our supreme court has explained that in deciding whether an involuntary manslaughter jury instruction is warranted, courts may consider several nondispositive factors: "(1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless." *McDonald*, 2016 IL 118882, ¶ 52.

¶ 45        The Appellate Court, Fifth District, recently considered a case where a five-year-old child died from a severe brain injury that could only have occurred from a high-speed car accident or " 'very severe blunt trauma to the head.' " *People v. Price*, 2021 IL App (5th) 190111-U, ¶ 24. A physician testified that it "would be 'exceedingly uncommon' for a person to be walking or talking" after sustaining an injury like that. *Price*, 2021 IL App (5th) 190111-U, ¶ 25. The defendant testified he did not hit the child, though he admitted he pushed him into his car seat and the couch and caused him to fall, and there was testimony to suggest that the child had been injured while playing two days prior. *Price*, 2021 IL App (5th) 190111-U, ¶¶ 35-36. The defendant requested an involuntary manslaughter jury instruction, which the trial court refused; the jury ultimately convicted him of first degree murder. *Price*, 2021 IL App (5th) 190111-U, ¶ 66. The Fifth District found that the trial court did not abuse its discretion in refusing the instruction, as the

defendant "did not present any evidence that he acted recklessly in performing the acts that killed" the child. *Price*, 2021 IL App (5th) 190111-U, ¶ 68. The court explained that "[f]irst degree murder was the only charge appropriate for the defendant—an apparently healthy 35-year-old man—who inflicted a devastating brain injury, the type commonly associated with high-impact motor vehicle collisions, plus various other injuries, on a defenseless 5-year-old boy." *Price*, 2021 IL App (5th) 190111-U, ¶ 68.

¶ 46        To give the jury instruction on involuntary manslaughter, there must have been "*some evidence* in the record that, if believed by the jury, [would] reduce the crime charged to a lesser offense." (Emphasis in original.) *McDonald*, 2016 IL 118882, ¶ 25. Here, defendant acknowledges that "there was evidence that would support an inference that [defendant] struck Jackson," but he argues that because there was no evidence about the number of blows, their force, and the circumstances at the time, the "jury could arguably have concluded that [defendant] was merely reckless to the possibility of death, and the jury should have been instructed accordingly."

¶ 47        We first note that the trial court appears to have confused the mental state of performing the act itself—the slap—with the mental state regarding the outcome—Jackson's death. The court believed that defendant's act of slapping Jackson was intentional and thus precluded a finding of recklessness. However, an action does not need to be accidental to be reckless. A defendant can be guilty of involuntary manslaughter if he or she committed an act intentionally while consciously disregarding a substantial and unjustifiable risk that such act would result in the death of another. See *People v. Taylor*, 212 Ill. App. 3d 351, 356 (1991) ("[I]nvoluntary manslaughter can result from blows with a bare fist where the defendant does not intend to kill or do great bodily harm and is reckless in delivering the blows."). The court thus

- 17 -

made a mistake in believing that an intentional act categorically precluded an involuntary manslaughter instruction.

¶ 48    However, there was no evidence to support giving the involuntary manslaughter instruction, and thus, the trial court did not abuse its discretion in refusing the instruction. In requesting an instruction on involuntary manslaughter, defendant identified no other act than a slap that would arguably have been reckless. But the only evidence adduced at trial was that it would have taken a force more significant than a slap to cause Jackson's death. Even defendant, in his second interview with Rezac, admitted, "[I]f I hit her repeatedly, then I hit her repeatedly. If this is what facts show, then that's what I did." As the court recognized, defendant's argument that he could have caused Jackson's death recklessly by slapping her in the face was "contrary to the testimony" that Jackson's bilateral brain injuries were not consistent with a single slap to the right cheek. As such, the court did not abuse its discretion in refusing defendant's tendered instruction.

¶ 49    Moreover, based on the evidence, the factors recounted by the supreme court in *McDonald*, 2016 IL 118882, ¶ 52, weigh against instructing the jury on the offense of involuntary manslaughter. We find this case is similar to *Price*, 2021 IL App (5th) 190111-U, ¶ 68. There was a disparity of strength between defendant and Jackson, who was an elderly woman with multiple serious health conditions. Defendant admits on appeal that it is "reasonable to infer that there was some disparity in strength" between defendant, who was 41 years old, six feet, one inch tall, and 175 pounds, and Jackson, who was 75 years old, five feet, seven inches tall, and 219 pounds.

¶ 50    Though defendant is correct that there was no testimony about the duration of the altercation, the number of blows, and the strength of the blows, Dr. Kemp and Dr. Youmans both testified that Jackson's injuries were caused by at least two severe, blunt force blows to the head, possibly inflicted by a foreign object, though it was uncertain which object could have been used.

Dr. Kemp further explained that the injury was so severe that Jackson "would not be able to get up on her own and get into a chair and not require help off of a floor." Though both physicians acknowledged that Jackson's blood thinners could have caused her to bleed more, the initial trauma still needed to be severe to cause that level of brain injury.

¶ 51        Additionally, Jackson was defenseless, considering her age and health. Jackson had osteoarthritis, emphysema, hypertension, atrial fibrillation, congestive heart failure, breast cancer, chronic kidney disease, and "a variety of other illnesses" and she was overweight and used a walker or a cane to walk.

¶ 52        There is no evidence that defendant acted recklessly but without knowledge of a strong probability of death or great bodily harm when he caused a "blunt injury to [Jackson's] scalp." Accordingly, the trial court did not abuse its discretion in refusing the involuntary manslaughter jury instruction.

¶ 53                        B. Sufficiency of the Evidence

¶ 54        Defendant next argues that the evidence was insufficient to find him guilty of first degree murder beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 55        It is the function of the trier of fact to determine the credibility of the witnesses, assess the weight given to their testimony, resolve conflicts in the evidence, and draw reasonable

inferences from that evidence. *People v. Baker*, 2022 IL App (4th) 210713, ¶ 35. These credibility determinations are entitled to great weight. *Baker*, 2022 IL App (4th) 210713, ¶ 35. In contrast, "[i]t is not the function of the reviewing court to retry the defendant," and thus, an appellate court will not "substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 56    Here, the evidence was sufficient for a rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. Viewed in the light most favorable to the State, the evidence showed that defendant likely abused Jackson repeatedly in the past based on her prior reports to physicians, the multiple bruises observed during her autopsy, and defendant's admissions. Dr. Kemp and Dr. Youmans both testified that Jackson's injuries were severe and unlikely to be caused by either a fall or a slap to the face, especially where Jackson's brain injuries were bilateral, indicating she was hit with blunt force in the head at least twice on different planes of her body. Though defendant told police he only slapped her in the face once and did not hit her with a foreign object, he also said that no one else was present in the apartment that night, he could not recall hitting her again, and on finding out about Jackson's death, he "said twice that he killed her." He also stated in his second interview with Rezac, "[I]f I hit her repeatedly, then I hit her repeatedly. If this is what facts show, then that's what I did," and, "Clint, I'm guilty. I'm guilty. I understand that." Defendant's account of the events of that night and early morning was also contradicted by the absence of alcohol in Jackson's blood at the time she was admitted to the hospital. We will not substitute our judgment for that of the jury's on the issue of the credibility of witnesses. Based on the medical testimony and defendant's statements to the police, the jury was entitled to find that defendant hit Jackson in the head with his fist or some other object hard enough to cause a severe brain bleed. The jury reasonably could have inferred that he knew hitting her that

hard in the head created a strong probability of death or great bodily harm, given that she was 75 years old and had many health conditions.

¶ 57                    C. Substitution of Judge for Cause

¶ 58        Defendant next argues that the trial court erred by denying his motion for substitution of judge for cause. However, the record does not support defendant's contention that the court denied his motion for substitution of judge for cause. Rather, defendant abandoned or waived his motion.

¶ 59        "In general, a party filing a motion is responsible for obtaining a ruling from the trial court on the motion." *People v. Brusaw*, 2023 IL 128474, ¶ 17. "A movant's failure to obtain a ruling on a motion does not translate into a denial of the motion by the court." (Internal quotation marks omitted.) *Brusaw*, 2023 IL 128474, ¶ 17. Instead, "if no ruling is obtained, the motion is presumed to have been abandoned or waived by the movant, unless circumstances indicate otherwise" and thus "presents no question with reference thereto arising on review." (Internal quotation marks omitted.) *Brusaw*, 2023 IL 128474, ¶ 17. This rule serves to ensure "that a movant, who is fully aware of the motion that was filed, cannot remain silent in the trial court and then, on appeal, 'take advantage of his failure to have [the] motion passed upon.' " *Brusaw*, 2023 IL 128474, ¶ 17 (quoting *People v. Hornaday*, 400 Ill. 361, 365 (1948)).

¶ 60        The supreme court in *Brusaw* held that "motions for substitution brought pursuant to section 114-5(a) [of the Code of Criminal Procedure of 1963] are subject to the common-law rule of abandonment or waiver." *Brusaw*, 2023 IL 128474, ¶ 28. Section 114-5(a) provides an automatic right of substitution of judge for cause, if the motion is filed within 10 days of the case being placed on a judge's trial call. 725 ILCS 5/114-5(a) (West 2020). Section 114-5(d) alternatively allows a party to file a motion for substitution of judge for cause outside of those first

10 days but requires an affidavit and states that "a hearing shall be conducted as soon as possible after its filing by a judge not named in the motion." 725 ILCS 5/114-5(d) (West 2020). We see no reason why the supreme court's application of abandonment or waiver for automatic substitution of a judge under section 114-5(a) would not apply with equal force to a motion for substitution of a judge for cause under section 114-5(d).

¶ 61    In this case, defendant abandoned his motion for substitution of judge for cause. Defendant first raised the issue orally on June 23, 2021. The State reminded the trial court of that pending oral motion on July 26, 2021, and stated that it would "waive the right to have a written motion." In August 2021, a different judge ruled that the court would not entertain the motion unless defendant filed it in writing. On August 19, 2021, defendant told the original trial judge that he wished to file a written motion with an accompanying affidavit but claimed he was unable to prepare it because he was not given access to the law library at the county jail. The court allowed defendant another opportunity to file a written motion and set the matter for two weeks later. On September 2, 2021, defendant indicated he still did not have access to the law library. On September 13, 2021, defendant indicated he was able to access the law library twice since September 2 but maintained that he needed more time. The court instructed defendant to keep a log of when he was allowed access, scheduled the trial for February 14, 2022, and stated that "if you do not have sufficient access to the law library in all of that time *** I'll be shocked."

¶ 62    Defendant never raised the motion for substitution again. Defendant had three years between his first oral motion for substitution in June 2021 and the eventual trial date in June 2024, during which he never filed a written motion for substitution or requested that his oral motion for substitution be ruled on. The record shows that the trial court attempted to accommodate defendant's desire to have more time to file a written motion, but defendant abandoned or waived

- 22 -

the motion. As a result, the court never had an opportunity to deny defendant's motion, and the motion thus "presents no question with reference thereto arising on review." (Internal quotation marks omitted.) *Brusaw*, 2023 IL 128474, ¶ 17.

¶ 63                                                D. Self-Representation

¶ 64            Defendant lastly argues that the trial court erred by denying him the right to represent himself. "A criminal defendant has the right to self-representation under both the United States and Illinois Constitutions." *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 32. To invoke this right, a waiver of counsel must be "clear and unequivocal, not ambiguous." *People v. Baez,* 241 Ill. 2d 44, 116 (2011). Importantly, "[c]ourts must indulge in every reasonable presumption against waiver of the right to counsel." (Internal quotation marks omitted.) *People v. Mayo*, 198 Ill. 2d 530, 538 (2002). The requirement that the request is unequivocal serves to "(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *Mayo*, 198 Ill. 2d at 538. In cases where "a defendant changes his mind after trial begins, *or does so repeatedly at any stage*, a court may find that the conduct is manipulative or abusive in some other way. If so, the conduct can be considered vacillation, and a trial judge may find the request equivocal." (Emphasis in original and internal quotation marks omitted.) *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 47. A defendant has the right "to change his mind more than once" but "does not have an evergreen right to change his election back and forth, no matter how 'clearly' he conveys each successive choice to the court." *Rainey*, 2019 IL App (1st) 160187, ¶ 49. Moreover, "any request for self-representation—even a first request, much less a third request—may be deemed belated and dilatory if it is made 'just before the commencement of trial' or 'after meaningful proceedings

have begun.' " *Rainey*, 2019 IL App (1st) 160187, ¶ 61 (quoting *People v. Burton*, 184 Ill. 2d 1, 24 (1998)).

¶ 65        In addition, a defendant's right to self-representation

"is not absolute, and trial courts may deny a defendant's request for self-representation under certain circumstances, including where a defendant's lack of civility and decorum would result in an abuse of the dignity of the courtroom [citation], where a defendant abuses the right to waive counsel as a tactic to delay or disrupt proceedings [citation], or where a defendant suffers from a severe mental illness and thus is not competent to conduct trial proceedings without counsel."

*Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33.

"A trial court's denial of a defendant's request to represent oneself is reviewed for an abuse of discretion," which " 'occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court.' " *Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33 (quoting *Seymour v. Collins*, 2015 IL 118432, ¶ 41).

¶ 66        In *Rainey*, the Appellate Court, First District, considered a case where the defendant changed his mind about being represented by counsel several times. *Rainey*, 2019 IL App (1st) 160187, ¶¶ 6-21. After removing his attorney twice, the defendant asked that the public defender's office be reappointed at the final status hearing before trial; the court granted his request and continued the trial. *Rainey*, 2019 IL App (1st) 160187, ¶ 16. At the next hearing, again intended to be the final pretrial conference, defendant asserted a conflict of interest between him and his attorney and tried to present multiple *pro se* motions that counsel refused to adopt. *Rainey*, 2019 IL App (1st) 160187, ¶¶ 18-20. The First District found that although the defendant's request to

represent himself was clear, "[g]iven defendant's alternating positions and the eleventh-hour timing of his request, his third demand for self-representation could be reasonably deemed vacillating and dilatory." *Rainey*, 2019 IL App (1st) 160187, ¶ 61. Though the defendant argued he did not intend to delay trial, but merely wished to file a *pro se* motion, "the trial court could have reasonably concluded that defendant was merely using that supposed disagreement with counsel as his excuse *du jour* for a delay of the trial date." *Rainey*, 2019 IL App (1st) 160187, ¶ 62. The court emphasized that "the defendant may not play a 'cat and mouse game' with the court by repeatedly demanding to change his election in pursuit of some tactical advantage to which he is not entitled." *Rainey*, 2019 IL App (1st) 160187, ¶ 50.

¶ 67        In this case, like *Rainey*, defendant changed his mind as to whether to be represented by counsel or represent himself several times, causing the trial date to be reset four times. Trial was continued in February 2021, when the trial court granted defendant's request to remove his first public defender, Bach. Trial was again continued in February 2021, when the court agreed to appoint a different assistant public defender, Patton, to represent defendant. Trial was continued a third time in June 2021, a month before trial, when defendant requested to remove Patton due to a conflict of interest. The State believed that this was a tactic to delay trial; however, the court allowed defendant's second request to proceed *pro se*. In February 2022, a few weeks before the new trial date, defendant requested another continuance.

¶ 68        Again, in June 2022, a month before the trial date, defendant expressed that he would like to have counsel reappointed, which the trial court allowed, and it again continued the trial. In August 2023, a month before the scheduled trial, defendant indicated he had a conflict of interest with his attorney, Doubet, and wanted to represent himself. The court found that defendant's reason was insufficient and for purposes of delay and denied defendant's request. In

May 2024, two weeks before trial was scheduled to begin, defendant again expressed that Doubet was not his attorney. Defendant was again so disruptive that the court ordered him to be removed from the courtroom. The court ultimately denied Doubet's motion to withdraw.

¶ 69 Though defendant expressed his desire to represent himself clearly, he changed his mind repeatedly, often only a few weeks before the trial date, which "could be reasonably deemed vacillating and dilatory." *Rainey*, 2019 IL App (1st) 160187, ¶ 61. Each time he changed his mind, the trial had to be continued. Though trial was initially set for March 2021, it was not actually held until June 2024, over three years later. Much of that delay—four continuances—can be attributed to defendant's vacillation about his representation. Defendant's conduct clearly showed that he expected his appointed counsel to do his bidding, and when they did not, relying on their own legal judgment, he sought to remove them for a nonexistent "conflict of interest." Given its long history with defendant, the trial court reasonably concluded that defendant was relying on this supposed disagreement with counsel to delay trial further. Under the circumstances, the court did not abuse its discretion in denying defendant's third motion to represent himself.

¶ 70 Additionally, the record shows that the trial court was concerned that "defendant's lack of civility and decorum would result in an abuse of the dignity of the courtroom" if he were allowed to represent himself at trial. *Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33. "[W]hen a *pro se* defendant 'deliberately engages in serious and obstructionist misconduct,' the judge may 'terminate' his self-representation." *Rainey*, 2019 IL App (1st) 160187, ¶ 74 (quoting *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975)). "Or, by the same logic, it may deny a later request to represent himself again; the fact that the defendant had revoked his previous waiver of counsel between his misconduct and his current request should make no difference to the analysis." *Rainey*, 2019 IL App (1st) 160187, ¶ 74. Here, defendant had to be removed from the courtroom twice

- 26 -

because he was extremely disruptive to the proceedings. The court was concerned that if defendant represented himself, "[h]e's going to be so disruptive at his trial that I'm going to have to have him removed and we do his jury trial without him being here and without him having a lawyer." On other occasions, when allowed to speak, defendant went on tirades about legal principles that were inapplicable to the case. He consistently objected to every action by the court and the State. Defendant thus showed "a persistent pattern of pretrial misconduct," not just "a single, isolated instance." *Rainey*, 2019 IL App (1st) 160187, ¶ 78. The court was rightly concerned about defendant's "lack of civility and decorum," and because defendant was represented by counsel at the time, rather than representing himself, the court was within its rights to deny defendant's last-minute request to represent himself. See *Rainey*, 2019 IL App (1st) 160187, ¶ 74. It was not an abuse of discretion for the court to deny defendant's third motion to represent himself.

¶ 71                                    III. CONCLUSION

¶ 72        For the reasons stated, we affirm the trial court's judgment.

¶ 73        Affirmed.

*People v. Rogatchev*, 2026 IL App (4th) 241165

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 19-CF-746; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | N. Scott Rosenblum and Nathan T. Swanson, of Rosenblum, Schwartz, Fry & Johnson, of St. Louis, Missouri, for appellant. |
| **Attorneys for Appellee:** | Jodi M. Hoos, State's Attorney, of Peoria (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |